

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

NOS. **PD-529-09 through PD-545-09**

**Ex parte JAMES W. ELLIS and JOHN D. COLYANDRO, Appellants**

**ON APPELLANT'S AND STATE'S
PETITIONS FOR DISCRETIONARY REVIEW
FROM THE THIRD COURT OF APPEALS
TRAVIS COUNTY**

**KELLER, P.J., delivered the opinion of the unanimous Court.**

This case involves constitutional challenges to the money laundering statute and to certain Election Code provisions relating to corporate contributions. With respect to the money laundering statute, we determine that the court of appeals inappropriately resolved issues that are not cognizable in a pretrial habeas proceeding. With respect to the Election Code provisions, we determine that the statutes are not facially unconstitutional. Consequently, we sustain the State's first ground for review and otherwise affirm the judgment of the court of appeals.

## I. BACKGROUND

The State filed a number of indictments against Colyandro for election code violations. These indictments charged that, in 2002, on behalf of the Texans for Republican Majority Political

Action Committee (TRMPAC), Colyandro knowingly accepted from several corporations political contributions in various dollar amounts that he knew were contributed in violation of Chapter 253 of the Election Code. The State also filed one indictment against Colyandro for money laundering and one indictment against Ellis for money laundering. The money laundering indictments alleged that the above contributions were transferred to the Republican National Committee (RNC) via a $190,000 check made payable to the Republican National State Elections Committee (RNSEC) that Colyandro signed and delivered to Ellis and that Ellis delivered to the RNC. The State later filed re-indictments of the money laundering charges. The re-indictments omitted any references to a "check," instead alleging the "transfer of funds of the value of $190,000" from TRMPAC to the RNSEC.

Ellis and Colyandro filed pretrial habeas corpus applications, which the trial court denied. On appeal, they argued that the Election Code provisions governing political contributions were unconstitutionally vague and overbroad with respect to protected First Amendment expression. They further argued that the money laundering statute was unconstitutionally vague if it were interpreted to apply to checks or to a transaction involving something other than cash.

Drawing a sharp distinction between contributions and expenditures, the court of appeals held that laws governing contributions were not subject to "strict scrutiny" but were reviewed under a less rigorous test of being "closely drawn" to meet a "sufficiently important interest."[1] Responding to the appellants' overbreadth argument, the court of appeals rejected the contention that Supreme Court cases prohibiting restrictions on expenditures had any application to the Texas Election Code

---

[1] *Ex parte Ellis*, 279 S.W.3d 1, 19 (Tex. App.–Austin 2008).

provisions that restricted contributions.[2]  Moreover, the court of appeals held that the appellants failed to demonstrate that the contribution restrictions reached a substantial amount of protected conduct.[3]  With respect to the appellants' vagueness claims, the court of appeals concluded that the Election Code provisions, though broad and complex, were not so indefinite as to deprive a person of ordinary intelligence of the ability to understand what was prohibited.[4]  The court held that "a person of ordinary intelligence is capable of properly designating whether his or her contribution is intended to support or oppose a measure (lawful), be used solely for administrative expenses (lawful), be used for unregulated expenditures (lawful), or be used [] 'in connection with' a candidate's campaign (unlawful)."[5]  The court of appeals explained that "the statute places burdens on those making and accepting corporate contributions to designate and to ascertain the purpose of a contribution before giving it or using it in a campaign for elective office."[6]

The court of appeals answered the contention that the money laundering statute was unconstitutionally vague if it applied to checks by holding that the statute did not apply to checks.[7] Whether the statute encompassed checks depended on whether checks were included in the

---

[2] *Id.* at 20.

[3] *Id.* at 20-21.

[4] *Id.* at 21-23.

[5] *Id.* at 22.

[6] *Id.*

[7] *Id.* at 23-30.

definition of "funds."[8]  The statute provided that the term "funds" includes a list of specific items.[9]

According to the court of appeals, the term "includes" meant that the list was not exclusive.[10]  But,

relying upon the principle of *ejusdem generis*, the court held that the term "funds" could only

encompass items that were of the "same kind, class, or nature" as the items in the list.[11]  The court

of appeals then observed that all the items in the list were forms of cash or cash equivalents.[12]  The

court of appeals held that checks were unlike these items because a check is not guaranteed, and

therefore does not function as cash or a cash equivalent:

> Coin, currency, cash, or items that function as cash equivalents are, themselves, payment. By contrast, a check is a promise or commitment to make payment when the check is later presented for payment. Accordingly, payment by check that is not guaranteed in some way, such as a cashier's check or teller's check, is not payment in the same sense as payment by cash or cash equivalent.[13]
>
> * * *
>
> Cash or cash equivalents such as currency, Treasury notes, silver certificates, foreign bank drafts, cashier's checks, or other forms of payment similar to those enumerated in the pre-2005 version of section 34.01 are not at all similar to checks or other non-guaranteed negotiable instruments as a medium of exchange. Cash or a cash equivalent is, without more, a form of payment, and once the currency or other cash equivalent is delivered, payment is accomplished and is no longer contingent on some future event.[14]

---

[8]  *Id.* at 23-24.

[9]  *Id.* at 24.

[10]  *Id.*

[11]  *Id.* at 25.

[12]  *Id.* at 25-26.

[13]  *Id.* at 25.

[14]  *Id.* at 26.

During this discussion, the court of appeals noted that a "foreign bank draft" was a "teller's check," with payment guaranteed, and thus constituted a cash equivalent.[15] "Foreign bank drafts" was among the items in the statutory list.[16] The court of appeals also cited legislative history in support of its conclusion that the version of the money laundering statute that was applicable to the appellants was not intended to apply to checks.[17]

In a motion for rehearing, the State argued that the court of appeals erred in discussing whether or not the money laundering statute applies to checks because the appellants' claim with respect to checks was an "as applied" challenge to the statute that was not cognizable in pretrial habeas proceedings.[18] In a supplemental opinion, the court of appeals conceded that it "may consider only facial challenges on pretrial habeas."[19] Nevertheless, the court of appeals concluded that the State's contention was without merit. First, the court concluded that the appellants had in fact raised a facial challenge to the statute because they did not contend that the term 'funds' was vague "only as it applied in these indictments."[20] Although the appellants argued that the money laundering statute was unconstitutional if money laundering could be committed by check, the court of appeals

---

[15] *Id.* at 26 n.21.

[16] *Id.* at 24.

[17] *Id.* at 27-29. In 2005, the money laundering statute was amended to explicitly include checks within the definition of "funds." *See id.* at 28 (citing Acts 2005, 79th Leg., R.S., ch. 1162, §1).

[18] *See id.* at 37 (supplemental opinion). The State also challenged the court of appeals's statutory construction analysis, *see id.* at 39-41, but, given our disposition of the State's first ground for review, *see* this opinion, *infra*, we are not concerned with that challenge here.

[19] *Id.*

[20] *Id.* at 37-38.

found that the appellants also argued more generally that "dictionaries offer many and divergent definitions of 'fund,' which are inconsistent with the types of 'funds' enumerated in the statute" and that "the statute is unconstitutionally vague because it denies fair notice that it criminalizes conduct not within the enumerated classes of 'funds.'"[21] Second, the court of appeals concluded that, even if some of the appellants' complaints could be characterized as raising an "as applied" challenge, resolution of those complaints was necessary to resolving the facial challenge at issue on appeal.[22] In support of this conclusion, the court relied upon a statement by the Supreme Court in *Hoffman Estates v. Flipside, Hoffman Estates Inc.*,[23] that in analyzing a facial overbreadth or vagueness challenge, "[a] court should . . . examine the complainant's conduct before analyzing other hypothetical applications of the law."[24]

In a dissent to the refusal to hear the case en banc,[25] Justice Henson criticized the court of appeals panel's opinion as "overbroad and rife with dicta."[26] She believed that the panel, in concluding that the money laundering statute did not apply to checks, had reached the merits of an "as applied" challenge that was not properly before the court.[27] She characterized the appellants'

---

[21] *Id.* at 38 (some internal quotation marks omitted).

[22] *Id.*

[23] 455 U.S. 489 (1982).

[24] *Ellis*, 279 S.W.3d at 38 (quoting *Hoffman Estates*, 455 U.S. at 495); *see also Ellis*, 279 S.W.3d at 38-39.

[25] Justice Henson requested that the cases be heard en banc, and that request was overruled. *Id.* at 30.

[26] *Id.* at 31 (Henson, J., dissenting).

[27] *Id.*

challenge as an "as applied" challenge "in sheep's clothing" because "the State's interpretation of the statute must be correct in order for their vagueness challenge to succeed."[28]  Justice Henson further concluded that, because the appellants conceded that the term "funds" plainly includes cash or currency, a facial challenge must necessarily fail on that basis.[29]  She also observed that two Dallas Court of Appeals cases had upheld the sufficiency of the evidence to support money-laundering charges based on transactions involving checks[30] and that the federal money laundering statute "clearly criminalizes the laundering of checks."[31]  Justice Henson also criticized the panel's application of the principle of *ejusdem generis* and the conclusions drawn from the 2005 amendments to the money laundering statute.[32]

In a dissent to the overruling of the State's motion for reconsideration en banc,[33] Justice Patterson also argued that the court of appeals panel had ruled on an "as applied" vagueness challenge that was not properly before it.[34]  In her view, the money laundering indictments merely alleged the $190,000 check as the method of laundering the funds, but the actual funds were the

---

[28]  *Id.*

[29]  *Id.* at 32.

[30]  *Id.* at 33 (citing *Lee v. State*, 29 S.W.3d 570 (Tex. App.–Dallas 2000, no pet.) and *Davis v. State*, 68 S.W.3d 273 (Tex. App.–Dallas 2002, pet. ref'd)).  Justice Henson acknowledged that "the precise issue of whether checks were considered 'funds' under the money laundering statute was not before the court" in those cases.  *Ellis*, 279 S.W.3d at 33.

[31]  *Id.*

[32]  *Id.* at 35-37.

[33]  *See id.* at 41.

[34]  *Id.* 41-42 (Patterson, J., dissenting).

corporate contributions, which may or may not have consisted of checks.[35] Because a trial had not occurred, in which evidence could have been elicited as to the exact form of the corporate contributions, Justice Patterson concluded that a ruling on the appellants' vagueness challenge was premature.[36] Justice Patterson also concluded that any facial challenge made by the appellants failed because, by conceding that "funds" included cash, they could not demonstrate that the statute was vague in all its applications.[37]

The State filed a petition for discretionary review, arguing in its first ground that the court of appeals erred in discussing whether or not the money laundering statute applies to checks because the appellants' claim with respect to checks was an "as applied" challenge to the statute that was not cognizable in pretrial habeas proceedings.[38] Colyandro also filed a petition for discretionary review,

---

[35] *Id.*

[36] *Id.*

[37] *Id.* at 42-43.

[38] The State's grounds for review read as follows:

GROUND ONE: The court of appeals erred by addressing the appellants' "as applied" challenge to the 2002 money laundering statute brought in a pretrial writ of habeas corpus, where only a facial challenge was cognizable. In holding that this "as applied" challenge was actually a facial challenge, the court improperly looked behind the face of the indictment and misinterpreted a decision of the United States Supreme Court.

GROUND TWO: The court of appeals erred in performing unnecessary statutory analysis and in examining legislative history and treatises to interpret the meaning of terms in the statute when the plain text was not ambiguous and did not lead to absurd results.

Due to our disposition of the State's first ground for review, we do not reach its second ground for review.

arguing that the court of appeals erred in declining to apply a "strict scrutiny" analysis and erred in refusing to hold that the Election Code provisions were unconstitutionally vague or overbroad.[39] We granted both petitions.

## II. ANALYSIS

### A. Money Laundering

Regarding the State's petition, the first question that we confront was raised by Ellis's attorney at oral argument: "Why are we here?" The court of appeals affirmed the trial court's judgment in favor of the State, so the State "won" on appeal. Ordinarily, a first-level appellate court retains wide latitude to uphold a trial court's decision in a manner the appellate court deems appropriate.[40] But pretrial habeas, followed by an interlocutory appeal, is an "extraordinary remedy,"

---

[39] Colyandro's grounds for review read as follows:

GROUND ONE: The court of appeals erred in finding that Section 253.094 of the Texas Election Code was not unconstitutionally vague, employing a standard of review applicable to civil, not criminal cases.

GROUND TWO: The court of appeals erred in finding that Section 253.094 of the Texas Election Code was not unconstitutionally overbroad, employing a standard of review applicable to civil, not criminal cases.

In his brief, Colyandro breaks the discussion into three topics: (1) the appropriate standard of review, (2) vagueness, and (3) overbreadth. The State contends that the standard of review topic is the only issue fairly encompassed within Colyandro's petition and that we should not address the merits of the vagueness and overbreadth issues. We conclude, however, that the three topics outlined in Colyandro's brief were all fairly raised in his petition, and we will follow the three-point structure of his brief in our analysis of his claims.

[40] *See Menefee v. State*, 287 S.W.3d 9, 18 (Tex. Crim. App. 2009) (court of appeals that affirmed the trial court's judgment on one basis was not "compelled to address" an alternate argument for affirming the trial court's judgment); *State v. Plambeck*, 182 S.W.3d 365, 367 n.10 (Tex. Crim. App. 2005) (court of appeals did not err in failing to decide an issue that became moot because of its resolution of a different issue); *State v. Mercado*, 972 S.W.2d 75, 77 (Tex. Crim. App. 1998) (an appellate court may consider, for the first time on appeal, an alternate theory of law

and "appellate courts have been careful to ensure that a pretrial writ is not misused to secure pretrial appellate review of matters that in actual fact should not be put before appellate courts at the pretrial stage."[41] Consequently, whether a claim is even cognizable on pretrial habeas is a threshold issue that should be addressed before the merits of the claim may be resolved.[42] If a non-cognizable claim is resolved on the merits in a pretrial habeas appeal, then the pretrial writ has been misused, and the State can appropriately petition this Court to correct such misuse.

So, did the court of appeals resolve a non-cognizable claim? Generally, pretrial habeas is not available to test the sufficiency of the charging instrument[43] or to construe the meaning and application of the statute defining the offense charged.[44] Pretrial habeas can be used to bring a facial challenge to the constitutionality of the statute that defines the offense but may not be used to advance an "as applied" challenge.[45]

The appellants certainly asserted that the money laundering statute was facially unconstitutional, but such an assertion is not, by itself, enough. If a claim designated as a facial

---

applicable to the facts of the case which supports the trial court's decision). *But see Rushing v. State*, 85 S.W.3d 283, (Tex. Crim. App. 2002) (although the court of appeals affirmed the trial court's decision in favor of the State, we granted the State's petition for discretionary review and held that the court of appeals erred in finding a statute unconstitutional).

[41] *Ex parte Doster*, 303 S.W.3d 720, 724 (Tex. Crim. App. 2010) (internal quotation marks omitted) (quoting, in part, from *Ex parte Smith*, 178 S.W.3d 797, 801 (Tex. Crim. App. 2005)).

[42] *Doster*, 303 S.W.3d at 721, 721 n.2, 727.

[43] *Id.* at 724; *Weise v. State*, 55 S.W.3d 617, 620 (Tex. Crim. App. 2001).

[44] *See Ex parte Smith*, 185 S.W.3d 887, 893 (Tex. Crim. App. 2006) (*in pari materia* challenge not cognizable on pretrial habeas); *Weise*, 55 S.W.3d at 620-21 (whether illegal dumping statute requires a culpable mental state not ripe for review on pretrial habeas).

[45] *Weise*, 55 S.W.3d at 620-21.

challenge is in fact an as-applied challenge, courts should refuse to consider the merits of the claim.

The money laundering statute that the appellants are accused of violating provides: "A person commits an offense if the person knowingly . . . conducts, supervises, or facilitates a transaction involving the proceeds of criminal activity."[46] The term "proceeds" is defined to mean "funds acquired or derived directly or indirectly from, produced through, or realized through an act."[47] In turn, the term "funds" is defined as follows:

> (A) coin or paper money of the United States or any other country that is designated as legal tender and that circulates and is customarily used and accepted as a medium of exchange in the country of issue;
>
> (B) United States silver certificates, United States Treasury notes, and Federal Reserve System notes;
>
> (C) official foreign bank notes that are customarily used and accepted as a medium of exchange in a foreign country and foreign bank drafts.[48]

The court of appeals's supplemental opinion suggests that the appellants' challenge to the definition of "funds" was a facial challenge because it was not limited to the particular indictments in these cases. But unless First Amendment freedoms are implicated,[49] a facial vagueness challenge can succeed only if it is shown that the law is unconstitutionally vague in all of its applications.[50]

---

[46] T EX. PENAL CODE § 34.02(a)(2).

[47] *Id.*, § 34.01(4).

[48] *Id.*, § 34.01(2).

[49] *Long v. State*, 931 S.W.2d 285, 287-88 (Tex. Crim. App. 1996).

[50] *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987), which set forth the standard); *Sanchez v. State* 995 S.W.2d 677, 683 (Tex. Crim. App. 1999). Appellants contend that the *Salerno* standard no longer applies and instead argue that the test is whether the statute has "plainly legitimate sweep." In *State v. Markovich*, we recognized that the appropriate standard to apply for

Here, no one has argued that the money laundering statute implicates First Amendment activity, and we have no reason to think that it does so. It is not enough, then, that the appellants' constitutional challenge may have been somewhat broader than the indictments. That fact, standing alone, does not suffice to establish that the claim is a facial challenge because, despite this breadth, it still is not a claim that the law is vague in all of its applications.

A facial vagueness challenge to the definition of "funds" in the money laundering statute would have to take one of two forms. First, one could challenge the definition of "funds" as vague in its entirety. But the appellants conceded in their briefs to the court of appeals that the items listed in the statutory definition of "funds" were reasonably specific. They referred to the list as a "seemingly narrow definition," that was disrupted by the State's broad interpretation of the term "includes." The appellants took the position that the enumerated items were forms of cash, and they objected to the money laundering statute only insofar as it "criminalized transactions not involving cash."

There is a second form that a facial challenge could take in this case. One could challenge the definition of "funds" as vague insofar as it extends outside the statutory list. This second scenario for mounting a facial challenge is possible because the term "includes," as a term of "enlargement and not of limitation,"[51] essentially creates an implied "catch-all" provision. Courts

facial vagueness challenges was "the subject of debate within the U.S. Supreme Court." 77 S.W.3d 274, 278 (Tex. Crim. App. 2002). Our reading of *Washington State Grange* indicates that the debate has been settled in favor of the *Salerno* standard, 552 U.S. at 449, but, as in that case, *id.*, evaluation of the money laundering statute under the "plainly legitimate sweep" standard would not alter our disposition here. As our discussion will show, the existence of legitimate applications in this case also shows that the statute has a "plainly legitimate sweep."

[51] "'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are

have recognized that a catch-all provision can be unconstitutionally vague on its face even if the other, enumerated items in a statutory list are reasonably specific.[52]

But a challenge to the implied catch-all provision in this case is defeated by the inclusion of foreign bank drafts in the list. As we have observed above, the appellants claim that all of the items in the statutory list of "funds" are forms of cash,[53] and they claim that the term "funds" is vague to the extent that it encompasses items other than cash. "Foreign bank drafts" is one of the enumerated items in the list. For the appellants' characterization of the list to be correct, then, foreign bank drafts would have to be a form of cash, and in fact, the appellants (and the court of appeals) contend that a foreign bank draft is a form of cash because payment is guaranteed by the bank. We need not decide whether the characterization of foreign bank drafts as a form of cash is accurate. Assuming its accuracy for the sake of discussion, the characterization would apply equally to domestic bank drafts, also known as "cashier's checks"—a fact the court of appeals recognized in its opinion. But domestic bank drafts are not enumerated in the list, so they would be covered by the implied catch-all provision. And because the implied catch-all provision would cover at least one form of cash—domestic bank drafts, a.k.a. cashier's checks—the appellants "cash only" position, if assumed

---

excerpt." TEX. GOV'T CODE § 311.005(13).

[52] *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 769-70, 772 (1988) (catch-all provision found to be unconstitutionally vague, remand to determine whether unconstitutional provisions can be severed); *State v. Mullen*, 577 N.W.2d 505, 512 (Minn. 1998) (error in instructing jury on facially unconstitutionally vague catch-all provision was harmless in light of other nonvague provisions under which the jury was also instructed).

[53] Sometimes the appellants and the court of appeals refer to "cash equivalents." For the sake of discussion, future references to "a form of cash" in this opinion include the term "cash equivalents."

to be true, establishes that the implied catch-all provision is facially constitutional.[54]

What about the court of appeals's contention that it had to resolve whether the statute was constitutional "as applied" in order to resolve the appellants' facial challenge?  The short answer to this question is that the appellants did not really advance a facial challenge, but advanced an "as applied" claim that was disguised as a facial challenge.  Addressing the "as applied" substance of the claim resulted in a circumvention of the pretrial habeas cognizability limitations.

With respect to the court of appeals's reliance upon *Hoffman Estates* for the proposition that it should examine the appellants' conduct before analyzing other hypothetical applications of the law, we observe that the decision in *Hoffman Estates* was issued after a full trial.[55]  When the Supreme Court suggested addressing the complainant's conduct first,[56] it had a record detailing the conduct in question.  In the pretrial habeas action currently before us, all we have are the indictments.  Moreover, the rationale for first examining the conduct of the complaining party is that a person "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."[57]  The suggestion that a complaining party's conduct should be examined first is designed to quickly dispose of unmeritorious facial claims.  Given the cognizability limitations and the sparse record in pretrial habeas proceedings, an appellate court should not address a novel statutory construction argument when, under established law, the

---

[54] Because domestic bank drafts are in common use, a facial challenge would fail even under the "plainly legitimate sweep" standard advocated by the appellants.

[55]  455 U.S. at 493-94.

[56]  *See id.* at 495.

[57]  *Id.*

defendant's facial challenge is clearly without merit.

Moreover, the *Hoffman Estates* court upheld the facial validity of the ordinance at issue by finding that "at least some of the items sold by [the complaining party] are covered" clearly by the statutory language.[58] The Supreme Court did not feel the need to comprehensively determine what was and was not covered to uphold the facial constitutionality of the statute. It was enough to say that some things were clearly covered. In the present case, the court of appeals held that checks are not covered by the term "funds" because the term "funds" covers only forms of cash. In arriving at its holding, the court of appeals necessarily determined that the items contained in the statutory list, along with cashier's checks, were forms of cash that clearly constituted "funds" under the money laundering statute. Deciding that the term "funds" clearly covers at least those items that are forms of cash would itself have been sufficient to defeat a facial vagueness challenge. There was no need for the court of appeals to go further and decide that "funds" covered only forms of cash.

Consequently, we sustain the State's first ground for review, and we hold that the court of appeals improperly resolved an "as applied" challenge when it held that the money laundering statute did not apply to checks.

### B. Election Code

#### 1. *Overview*

We begin with a brief overview of the evolution of the Supreme Court's First Amendment jurisprudence with respect to money in elections. In *Buckley v. Valeo*, the Court upheld limitations on the amount of money a person may contribute to another person's campaign[59] but struck down

---

[58]  *Id.* at 500 (bracketed material inserted).

[59]  424 U.S. 1, 23-29 (1976).

limitations on independent expenditures made on behalf of a political cause or candidate.[60] Although a limitation upon the amount of money a person or group may contribute to a candidate or political committee "entails only a marginal restriction upon the contributor's ability to engage in free communication,"[61] a limitation upon independent expenditures "heavily burdens core First Amendment expression."[62] The Court found that contribution limitations were sufficiently justified by the danger of corruption or the appearance of corruption,[63] while these dangers were not sufficient to justify limitations on independent expenditures.[64]

In *Federal Election Comm'n v. Beaumont*, the Court would later say that this disparate treatment between contributions and independent expenditures was explained by a differing level of scrutiny applied to the two categories of activity.[65] Contribution regulations were justified so long as they were "closely drawn to match a sufficiently important interest," while expenditure regulations had to be "narrowly tailored to serve a compelling government interest."[66]

In *Austin v. Michigan State Chamber of Commerce*, the Supreme Court held that limitations on independent corporate expenditures were justified by a newly articulated, compelling government interest in preventing the "corrosive and distorting effects of immense aggregations of wealth that

---

[60] *Id.* at 39-56.

[61] *Id.* at 20-21.

[62] *Id.* at 47-48.

[63] *Id.* at 26-28.

[64] *Id.* at 45-48.

[65] 539 U.S. 146, 161-62 (2003).

[66] *Id.* at 162.

are accumulated with the help of the . . . unique state-conferred corporate structure."[67] *Beaumont* was decided after *Austin* and cited *Austin* for the proposition that the "special characteristics of the corporate structure" could threaten the integrity of the political process.[68] But the *Beaumont* case involved a ban on corporate contributions, rather than on expenditures, and the statute was analyzed under the more traditional rationale of preventing corruption.[69] In addition to preventing "war-chest" corruption, the *Beaumont* court explained that a ban on corporate contributions also served to prevent individuals from using the corporate form to circumvent valid contribution limits.[70] Recently, in *Citizens United v. Federal Election Comm'n*,[71] the Supreme Court overruled *Austin* and held that the government could not place limitations upon independent corporate expenditures.[72]

### 2. *Standard of Review*

Colyandro contends that the court of appeals should have reviewed the Election Code provisions under strict scrutiny—the compelling government interest test—rather than under the more lenient "sufficiently important interest" test applied to contributions in *Buckley* and *Beaumont*. First, Colyandro argues that strict scrutiny should apply to the extent that a law carries criminal sanctions. In support of this proposition, he cites *Reno v. American Civil Liberties Union*.[73] *Reno*

---

[67] 494 U.S. 652, 660 (1990).

[68] *Beaumont*, 539 U.S. at 153.

[69] *Id.* at 154.

[70] *Id.* at 155.

[71] 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010).

[72] *Citizens United*, 130 S. Ct. at 912-13, 175 L. Ed. 2d at 798-99.

[73] 521 U.S. 844 (1997).

is not on point because that opinion addressed the constitutionality of the Communications Decency Act,[74] not the regulation of political contributions. If the Supreme Court's caselaw were devoid of political contribution decisions, then we might look to *Reno* for guidance, but that is not the situation here, as we have *Buckley* and *Beaumont* to guide us.

Colyandro asserts that *Buckley* and *Beaumont* are distinguishable because the laws addressed in those cases "involved civil regulations on contributions, as opposed to criminal penalties." We find that Colyandro is mistaken in that regard. The *Buckley* lawsuit sought declaratory and injunctive relief.[75] The Attorney General of the United States was named as one of the defendants,[76] presumably because the plaintiffs feared potential criminal liability. Indeed, Colyandro observes that the independent expenditure limitations in *Buckley* did carry criminal penalties, and he cites the "expenditures" portion of the *Buckley* opinion for the proposition that "close examination" is required when "the legislation imposes criminal penalties in an area permeated by First Amendment interests."[77] But Colyandro overlooks the fact that the contribution limitations also carried criminal penalties, which was taken into account by the Court in *Buckley*, which held that the expenditure limitations were not needed to enforce the valid limitations upon contributions: "There is no indication that the substantial criminal penalties for violating the contribution ceilings combined with the political repercussion of such violations will be insufficient to police the contribution

---

[74] *Id.*

[75] *Buckley*, 424 U.S. at 8-9.

[76] *Id.* at 8.

[77] *See id.* at 40-41.

provisions."[78]

*Beaumont* involved a lawsuit by a corporation against the Federal Election Commission that challenged the constitutionality of a federal statute and some FEC regulations,[79] and it appears to have been in essentially the same procedural posture as *Buckley*. The *Beaumont* court recognized the criminal sanctions attached to illegal corporate contributions: "[M]uch of the periodic amendment [of election laws] was meant to strengthen the original, core prohibition on direct corporate contributions. The Foreign Corrupt Practices Act of 1925, for example, broadened the ban on contributions to include 'anything of value,' and criminalized the act of receiving a contribution to match the criminality of making one."[80] Applying strict scrutiny to an election statute on the basis that it carries a criminal penalty would also conflict with *Beaumont*'s pronouncement that "the degree of scrutiny turns on the nature of the activity regulated."[81]

Colyandro next argues that *Buckley* is distinguishable because it limited only the size of contributions, while the election statutes at issue here ban corporate contributions in their entirety. But *Beaumont* dealt with a ban on corporate contributions,[82] and Colyandro acknowledges that, in that case, the Supreme Court "held that a ban on direct corporate contributions does not change its analytical approach to the constitutional question." The Supreme Court explained that "restrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to

---

[78] *Id.* at 55-56.

[79] *Beaumont*, 539 U.S. at 149-50.

[80] *Id.* at 153 (bracketed material added).

[81] *See id.* at 162.

[82] *Id.* at 161-62.

relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression."[83] According to the Court: "It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself."[84] Nevertheless, Colyandro claims that "the Court has yet to rule on whether such a ban on contributions demands strict scrutiny when the statute at issue also imposes criminal penalties for violations," but as we have explained above, Colyandro is simply mistaken in that regard.

Finally, in a supplemental-authority letter, Colyandro suggests that our analysis should be affected by the recent Supreme Court decision in *Citizens United*.[85] Colyandro acknowledges that "the Supreme Court's explicit holding was limited to campaign expenditures," but he contends that "the ruling marks a philosophical shift in the Court's treatment of restrictions on corporate free speech." Colyandro argues: "Given the fact that contributions are a type of political speech, *Citizens United*'s broad language concerning the unlawfulness of restrictions on corporate speech logically extends to restrictions on corporate campaign contributions."

Although we agree that *Citizens United* has significantly affected the constitutional landscape with respect to corporate free speech by removing restrictions on independent corporate expenditures, we disagree with Colyandro's contention that the decision has had any effect on the Court's jurisprudence relating to corporate contributions. The Court explained that *Buckley*

---

[83] *Id.* at 161.

[84] *Id.* at 162.

[85] *Citizens United* was handed down after the oral arguments in the present case.

"distinguished direct contributions to candidates from independent expenditures."[86] The Court found that a later case had "little relevance" to the issue at hand because it "involved contribution limits, which, unlike limits on independent expenditures, have been an accepted means to prevent *quid pro quo* corruption."[87]

Two concurring opinions in *Citizens United* suggest continued support for the Court's prior pronouncements regarding corporate contributions. Chief Justice Roberts, joined by Justice Alito, remarked that *Austin* was an "aberration" that "undermined the careful line that *Buckley* drew to distinguish limits to contributions to candidates from limits on independent expenditures on speech."[88] The Chief Justice also explained that *Beaumont*, and certain other cases decided after *Austin*, did not in any way "reaffirm" *Austin*'s holding.[89] Justice Scalia observed that corporations are entitled to First Amendment protection because they are simply "associations of individuals."[90] If it is unconstitutional to limit an individual's independent expenditure, then it is necessarily unconstitutional to limit expenditures made by associations of individuals.[91] But if it is legitimate to limit an individual's contributions (*Buckley*), then it follows that laws can be enacted to prevent

---

[86] *Citizens United*, 130 S. Ct. at 901-02, 175 L. Ed. 2d at 785-86.

[87] *Id.*, 130 S. Ct. at 909, 175 L. Ed. 2d at 794 (discussing *Federal Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 210, 103 S. Ct. 552, 74 L. Ed. 2d 364 (1982)).

[88] *Citizens United*, 130 S. Ct. at 921, 175 L. Ed. 2d at 807-08 (Roberts, C.J., concurring).

[89] *Id.*, 130 S. Ct. at 919-20, 175 L. Ed. 2d at 806.

[90] *Id.*, 130 S. Ct. at 929, 175 L. Ed. 2d at 816 (Scalia, J., concurring).

[91] *See id.* ("The [First] Amendment is written in terms of 'speech,' not speakers. Its text offers no foothold for excluding any category of speaker, from single individuals to partnerships of individuals, to unincorporated associations of individuals, to incorporated associations of individuals.")

associations of individuals from being used to circumvent those contribution limits (*Beaumont*).

### 3. *Vagueness*

When First Amendment freedoms are implicated, a criminal law must: (1) be sufficiently clear to afford a person of ordinary intelligence a reasonable opportunity to know what is prohibited, (2) establish determinate guidelines for law enforcement, and (3) be sufficiently definite to avoid chilling protected expression.[92] When a vagueness challenge involves First Amendment considerations, a criminal law may be held facially invalid even if the law has some valid application.[93] "But perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."[94]

Colyandro's prosecution arises from the interplay of several provisions of the Election Code. Texas Election Code § 253.003 provides in relevant part that "[a] person may not knowingly accept a political contribution the person knows to have been made in violation of this chapter."[95] Under § 253.094, "[a] corporation . . . may not make a political contribution . . . that is not authorized by this subchapter."[96] A "contribution" is "a direct or indirect transfer of money, goods, services, or any other thing of value,"[97] and a contribution constitutes a "political contribution" if it is "a campaign

---

[92] *Long*, 931 S.W.2d at 287.

[93] *Id.* at 288 (if First Amendment is involved, "criminal law may be held facially invalid even though it may not be unconstitutional as applied to the defendant's conduct").

[94] *United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)) (internal quotation marks omitted).

[95] T ex. ELECTION CODE § 253.003(b).

[96] *Id.*, § 253.094(a).

[97] *Id.*, § 251.001(2).

contribution or an officeholder contribution."[98]  A "campaign contribution" is "a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure."[99]

### a. Issue Advocacy

Colyandro argues that this statutory scheme is unconstitutionally vague because a corporation that makes a contribution for the purpose of advocating an issue would not know whether the contribution was legal. He asks: "[I]f a certain political candidate is the only person supporting a particular measure, and the corporation knows that any money given to a political committee supporting the measure would assist this candidate's campaign, then has the corporation made a contribution 'in connection with' a campaign for elective office?"  Colyandro observes that the Election Code allows certain corporate contributions in support of measures, but he overlooks the significance of the wording of the provision in question.

As we explained above, corporate political contributions are prohibited unless authorized in the Election Code.  The Code authorizes corporate contributions on a measure under the following circumstances: "A corporation . . . may make campaign contributions from its own property in connection with an election on a measure only to a political committee for supporting or opposing measures exclusively."[100]  Under this statute, a corporation can contribute money to support or oppose a measure, but only if it gives that money to an entity devoted exclusively to measures, i.e. an entity that does not contribute to candidates.  A corporation violates the law if it makes a

---

[98]  *Id.*, § 251.001(5).

[99]  *Id.*, § 251.001(3).

[100]  *Id.*, § 253.096.

contribution to a political committee for the purpose of supporting or opposing a measure if that political committee also contributes to candidates. The exclusivity aspect of the provision seems designed to prevent diversion of funds from an acceptable purpose (supporting or opposing a measure) to an unacceptable purpose (supporting or opposing a candidate). A corporation can be confident that it is following the law if the contribution is given to a political committee devoted exclusively to measures because that political committee cannot make a contribution to a candidate. And a corporation can be equally confident that a political contribution given to an entity that is not devoted exclusively to measures is a violation of the law unless authorized by another provision of the Election Code. Corporations are also allowed to contribute to political parties under certain circumstances.[101]

### b. Designation

Colyandro also contends that the court of appeals's holding that the election statute is not vague hinges upon the court's determination that a person can "designate" the purpose of a contribution. But, he argues, the whole point of *Buckley*'s holding with respect to contributions is that the contributor does not have to designate anything—it is the person who receives the contribution who decides how the money is spent. If a corporation must designate the purpose for which a contribution is used, then, Colyandro contends, the contribution becomes "closer to an expenditure" under the Supreme Court's jurisprudence.

An understanding of the court of appeals's "designation" discussion requires an examination of some arguments made by Colyandro in the court of appeals. Colyandro suggested two scenarios in which the Election Code failed to provide adequate guidance regarding what conduct is

---

[101] *See id.*, §§ 253.104, 257.001, 257.002, 257.004.

prohibited. First, he contended that a corporation might wish to make a donation to a group that advocates in favor of a particular issue. We have addressed this argument above. A corporation may make a political contribution to a group that favors a measure but only if the group does not contribute to candidates. In a sense, the corporation "designates" the purpose of the contribution by giving it to a group that can use it only for a certain purpose.

The second scenario Colyandro presented to the court of appeals was based on § 253.100, which governs expenditures made by a corporation to finance the establishment or administration of a general-purpose committee.[102] Colyandro contended that this law allowed TRMPAC to accept corporate money for establishment and administration, but he contended that the law offered no clear definition of the phrase "establishment or administration," so that a corporate donor would have to guess whether a donation would fit that category.

Under § 253.100, a corporation may create its own political committee.[103] The corporation may then use this political committee to solicit contributions from shareholders, employees, and their families.[104] The corporation is permitted to make expenditures for the maintenance and operation of the committee.[105] The Legislature set out a list of twelve items included as qualifying expenditures (*e.g.*, office equipment and utilities)[106] and a list of eight items for which expenditures

---

[102] *See id.*, § 253.100.

[103] *See id.*, § 253.100(a).

[104] *Id.*, § 253.100(b).

[105] *Id.*, § 253.100(a).

[106] *Id.*, § 253.100(a)(1)-(12).

may not be made.[107]  It appears that contributions made by a corporation to such a committee would not be considered to be expenditures.[108]  But even assuming that they could be considered the same, it is nevertheless clear that § 253.100 contemplates expenditures made by a corporation for certain purposes.  A contribution with no strings attached would not qualify as such an expenditure.

To the extent that the court of appeals may have suggested that there is no such thing as an undesignated corporate political contribution, the error it made was minor.  It would be more accurate to say that there is no such thing as a legal undesignated corporate political contribution.  Individuals can legally make undesignated political contributions, but corporations cannot.  A corporation must designate the purpose of the political contribution by contributing to a political committee that is exclusively devoted to measures, by making expenditures for maintenance or operation of a corporate political committee, or by contributing to a political party under certain narrowly defined conditions.

### c. "in connection with"

Colyandro also argues that the phrase "in connection with a campaign for elective office" is unconstitutionally vague for the same reasons that the phrase "relative to a clearly identified candidate" was found problematic in *Buckley*.  But the Supreme Court's problem with the latter phrase arose in the context of independent expenditures, not contributions.[109]  The Court addressed a similarly broad phrase, "'for the purpose of influencing' an election," and found that its use

---

[107]  *Id.*, § 253.100(d)(1)-(8).

[108]  *See id.*, § 251.001(8)("'Direct campaign expenditure' means a campaign expenditure that does not constitute a campaign contribution by the person making the expenditure").

[109]  *Buckley*, 424 U.S. at 39-44.

presented "fewer problems in connection with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution."[110] Under this limited definition, "[f]unds provided to a candidate or political party or campaign committee either directly or indirectly through an intermediary constitute a contribution. In addition, dollars given to another person or organization that are earmarked for political purposes are contributions under the Act."[111] Moreover, though the Court did not address a vagueness argument in *Beaumont*, it is nevertheless worth pointing out that the Court upheld against a First Amendment challenge the contribution aspect of a statute that makes it "unlawful . . . for any corporation whatever . . . to make a contribution or expenditure in connection with" certain federal elections.[112]

Colyandro points to the Supreme Court's statement that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application."[113] Again, this statement was made with respect to independent expenditures.[114] The Supreme Court has not suggested that a similar problem arises with respect to contributions. The problem arises with respect to independent expenditures because expenditures on some types of speech are allowed while others are not, and the dividing line between them is

---

[110] *Id.* at 24 n.24.

[111] *Id.*

[112] 539 U.S. at 149. As with our statute, the federal election statute allowed a corporation to form a political committee for the purpose of soliciting contributions from its shareholders and employees. *Id.*

[113] *Buckley*, 424 U.S. at 42.

[114] *Id.*

wholly subjective.[115]  But, as Colyandro has pointed out, and as with the statute in *Beaumont*, the Election Code provisions at issue here effect a complete ban on undesignated corporate political contributions.[116]

### d. Intent

Finally, Colyandro contends that vagueness inheres in the requirement that the contribution be made "with the intent that it be used" for prohibited purposes.   He claims that a contributor cannot know whether the intended use of the contribution would be construed as being in connection with a campaign for political office[117] and that the recipient cannot know the intent of the contributor, especially if the contributor is a corporation.  Colyandro further argues that enforcement of the law is virtually impossible because law enforcement will not be able to ascertain the intent of the corporate contributor or the recipient:

> Given that the Election Code does not force the corporate contributor to report the purpose of the contribution, law enforcement will be hard-pressed to determine when an acceptor of an unlawful contribution actually knew that the contribution was given with an unlawful intent.   Likewise, prosecuting a corporate contributor for intentionally making an unlawful contribution would be close to impossible in the absence of a legislative requirement that the corporation report the purpose of the contribution.

But the Supreme Court has held that the practical difficulty a factfinder may have in ascertaining

---

[115]  *Id.* at 42-43.

[116]  *See Beaumont*, 539 U.S. at 161-63 (corporate participation limited to establishing and paying the administrative expenses of political action committees).

[117]  Our discussions above have largely answered the contention that a contributor cannot know whether the contribution will be construed as intended for use in connection with a campaign for elective office.  Corporations are not permitted to make undesignated political contributions. What remains to be addressed is the possibility that a contribution does not qualify as a "political contribution" because it is *not* intended to be used in connection with an election, *e.g.*, a contribution made for the purpose of lobbying the legislature.

intent does not render a law unconstitutionally vague:

> What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent"—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings. There is no such indeterminacy here. The statute requires that the defendant hold, and make a statement that reflects, the belief that the material is child pornography; or that he communicate in a manner intended to cause another so to believe. Those are clear questions of fact. Whether someone held a belief or had an intent is a true-or-false determination, not a subjective judgment such as whether conduct is "annoying" or "indecent." Similarly true or false is the determination whether a particular formulation reflects a belief that material or purported material is child pornography. To be sure, it may be difficult in some cases to determine whether these clear requirements have been met. "But courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred."[118]

Moreover, the Supreme Court has long since taken the position that intent can be ascertained with respect to corporations for the purpose of imposing criminal liability:

> Mr. Chief Justice Feld, said: "We think that a corporation may be liable criminally for certain offenses of which a specific intent may be a necessary element. There is no more difficulty in imputing to a corporation a specific intent in criminal proceedings than in civil."
>
> \* \* \*
>
> It is true that there are some crimes, which in their nature cannot be committed by corporations. But there is a large class of offenses, of which rebating under the Federal statutes is one, wherein the crime consists in purposely doing the things prohibited by statute. In that class of crimes we see no good reason why corporations may not be held responsible for and charged with the knowledge and purposes of their agents, acting within the authority conferred upon them.[119]

---

[118] *Williams*, 553 U.S. at 306 (citation omitted).

[119] *New York Central & Hudson Riv. R.R. Co. v. United States*, 212 U.S. 481, 483 (1909) (quoting Chief Justice Feld in *Telegram Newspaper Co. v. Commonwealth*, 172 Mass. 294, 297, 52 N.E. 445, 446 (1899)).

The Election Code provisions at issue require that a contributor have a certain intent before the contribution is deemed illegal, and it requires that a recipient know that a contribution is in fact illegal, which entails knowing the intent of the contributor, before imposing criminal liability. The State has the burden to prove the applicable culpable mental states, and if it cannot, then a defendant charged under these provisions is entitled to an acquittal.

We conclude that the Election Code provisions at issue here are not facially unconstitutional due to vagueness.

### 4. Overbreadth

To vindicate First Amendment interests and prevent a chilling effect on the exercise of First Amendment freedoms, the overbreadth doctrine allows a statute to be invalidated on its face even if it has legitimate application, and even if the parties before the court have suffered no constitutional violation.[120] The overbreadth doctrine is "strong medicine" that should be employed "sparingly" and "only as a last resort."[121] "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."[122]

Colyandro contends that the restrictions on corporate contributions are overbroad because they encompass issue advocacy by prohibiting some contributions with respect to measures. He argues: "[I]f an election on a measure coincides with a political candidate's support for this measure, then a contribution to an election on this measure is 'in connection with' that candidate's campaign, especially if the candidate is one of the sole supporters of the measure. However . . . § 253.094

---

[120] *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

[121] *Id.* at 613.

[122] *Id.* at 615.

would prevent such issue advocacy . . . ."

Colyandro's contention about the operation of the statute is not entirely correct. As we explained above in connection with his vagueness claim, a corporation may make a political contribution with respect to a measure, so long as the contribution is to a political committee devoted exclusively to measures.[123] That a particular candidate may be associated with the measure has no effect on this authorization. As we also explained above, it is true that a corporation may not make a political contribution with respect to a measure to a political committee that also contributes to candidates.[124] That is so, regardless of whether or not a particular candidate is associated with the measure in question.

We decide that the prohibition against making corporate political contributions on a measure to a mixed-purpose political committee is "closely drawn to match a sufficiently important interest."[125] This prohibition serves to prevent the diversion of corporate "measure" money to candidates, and thus ensures that the prohibition against corporate contributions to candidates will not be circumvented.[126] The law is narrowly drawn because it addresses a narrow aspect of political association while allowing corporations several alternate avenues for political expression with

---

[123] T EX. ELECTION CODE, § 253.096.

[124] *Id.*; § 253.094.

[125] As we have already explained above, the "sufficiently important interest" test, not strict scrutiny, is the appropriate standard. *See Buckley*, 424 U.S. at 25-29; *Beaumont*, 539 U.S. at 162.

[126] *See Beaumont*, 539 U.S. at 155 (important interest in preventing the circumvention of valid contribution limits).

respect to measures.[127] First and most obviously, a corporation may contribute to a political committee devoted exclusively to measures.[128] Second, a corporation may create its own political committee, which can then solicit contributions from the corporation's shareholders, employees, and their families, and any contributions received may then be contributed without being subject to corporate limitations.[129] Finally, a corporation may make independent expenditures (*e.g.*, buy its own issue ads), make press releases, and otherwise have its agents directly engage in communication with respect to a measure (or a candidate, for that matter).[130] To the extent that Colyandro's arguments address more broadly the concept of issue advocacy, regardless of whether a measure is slated for election, the second and third avenues detailed above afford sufficient avenues for free

---

[127] *See Buckley*, 424 U.S. at 28-29 ("The Act's $1,000 contribution limitation focuses precisely on the problem of large campaign contributions -- the narrow aspect of political association where the actuality and potential for corruption have been identified -- while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources.").

[128] T EX. ELECTION CODE § 253.096.

[129] T EX. ELECTION CODE § 253.100; *see also id.*, § 253.092 ("If a political committee the only principal purpose of which is accepting political contributions and making political expenditures incorporates for liability purposes only, the committee is not considered a corporation for purposes of this subchapter."). *See Beaumont*, 539 U.S. at 162-63 ("[T]he section permits some participation of unions and corporations in the federal electoral process by allowing them to establish and pay the administrative expenses of (PACs). The PAC option allows corporate political participation without the temptation to use corporate funds for political influence, quite possibly at odds with the sentiments of some shareholders or members, and it lets the government regulate campaign activity through registration and disclosure, without jeopardizing the associational rights of advocacy organizations' members.") (Citations and internal quotation marks omitted).

[130] *See Buckley*, 424 U.S. at 28-29. *See also Citizens United*, *passim* (overturning federal limitations on corporate independent expenditures).

expression.[131]  We reject Colyandro's overbreadth contention.

### III. CONCLUSION

We sustain the State's first ground for review and hold that the court of appeals should not have addressed an "as applied" challenge to the money laundering statute.  However, we agree with the court of appeals's conclusion that the Election Code provisions are not facially unconstitutional. Therefore, we affirm the judgment of the court of appeals.

Delivered:   April 28, 2010
Publish

---

[131]  *See Buckley*, 424 U.S. at 28-29; *Beaumont*, 539 U.S. at 162-63.