OPINION
 

 DIANA GRIBBON MOTZ, Circuit Judge:
 

 A jury convicted Edward R. Butler of one count of bankruptcy fraud, in violation of 18 U.S.C. § 152 (1994 & Supp. IV 1998) and five counts of money laundering, in violation of 18 U.S.C. § 1957 (1994). On appeal, Butler’s principal contention is that his money laundering convictions cannot stand because they are based on the very same transactions that form the basis for his bankruptcy fraud conviction. Butler maintains that the funds involved in these transactions could not constitute “criminally derived property,” as required by the money laundering statute, because these funds became “criminally derived” only after the fraudulent transactions were complete. Although we agree that the statute prohibits only the laundering of “criminally derived property,” we must reject Butler’s argument. At the time of the charged money laundering transactions, Butler had already concealed the funds from the bankruptcy trustee, and the funds that he laundered therefore were “criminally de
 
 *828
 
 rived property.” We also reject Butler’s other arguments and so affirm his convictions and sentence.
 

 I.
 

 The government introduced’ evidence from which the jury could find the following facts. After filing for bankruptcy in July 1990, Butler settled a debt owed to him by the Rhema Development Corporation and its principals, Reverend and Mrs. Cornelius Showell, who were also in bankruptcy at the time. Butler had sold a funeral home to the Showells during the 1980’s, and he had taken the note as part of the purchase price, with stock in the funeral home held as collateral. The Sho-wells agreed to pay Butler a $350,000 settlement, with payments to be made into an escrow account for which the parties’ attorneys would be joint signatories. Butler disclosed the settlement plan to his creditors, but he did not obtain the approval of the bankruptcy court.
 

 Pursuant to this plan, the Showells paid $65,000 into the escrow account but fell behind in their payments. The parties then negotiated a new arrangement. On October 15, 1991, Butler released back to the Showells the $65,000 that had been held in escrow; the Showells then issued three checks: one for $100,000 payable to Butler, and two others, for $100,000 and $150,000 respectively, payable to James Adkins, an associate of Butler who had acquired an interest in the funeral home. Butler did not report any of these transactions to the bankruptcy trustee or his creditors.
 

 Butler used the funds realized from the first $100,000 check, payable to him, for personal expenses; Adkins kept the funds from the second $100,000 check. The government alleged that Butler fraudulently concealed from the bankruptcy trustee the funds derived from both of these checks.
 

 With respect to the remaining $150,000 check, Butler was alleged to have
 
 both
 
 concealed these funds from the bankruptcy trustee
 
 and
 
 laundered them. Upon receipt of this check, Butler caused Adkins to endorse it and transfer it to him. Butler then gave the check to Father Edward Miller, a trusted friend. Father Miller, apparently unaware of the origins of the check, held the funds realized from this check on Butler’s behalf in bank accounts for over a year.
 

 Between September 1992 and January 1993, Butler directed Father Miller to draw on the $150,000 in order to purchase four cashier’s checks payable to Bishop Randolph Caines, a Philadelphia pastor and associate of Butler. These four transactions constitute the basis for Counts II through V of the indictment, which charge Butler with aiding and abetting money laundering in violation of 18 U.S.C. § 1957. Bishop Caines used a substantial portion of the money to open an account, over which Butler had control, at First Fidelity Bank in Philadelphia. In April 1993, Butler directed Alice Tatum, Bishop Caines’ assistant, to purchase a cashier’s check payable to “S. Lee Martin.” This transaction became the basis for Count VI of the indictment, also charging Butler with aiding and abetting money laundering. The government alleges that the funds represented by this last check were eventually used to purchase a lien on Butler’s house.
 

 Count I of the indictment charges that, from on or about the date of the Rhema-Showell settlement until 1995, Butler fraudulently concealed from the bankruptcy estate the entire $350,000 received from the settlement.
 

 Butler’s first trial ended in a hung jury, but his second trial resulted in convictions on all six counts.
 

 II.
 

 Butler contends that we must reverse his convictions for money laundering because the funds used to purchase the five cashier’s checks involved in the five money laundering counts did not constitute “criminally derived property.” Butler ar
 
 *829
 
 gues that these funds did not become “criminally derived property” until he completed some act of bankruptcy fraud, and he maintains that the government failed to prove completion of such an act prior to the purchase of the checks. Although the extent to which Butler has preserved this argument for appellate review is not entirely clear,
 
 [1]
 
 for purposes of this appeal we give him the benefit of the doubt and treat it as a challenge to the sufficiency of the evidence, fully preserved for review by a timely Rule 29 motion.
 
 See
 
 Fed.R.Crim.P. 29. As such, we must sustain his convictions if the record, viewed most favorably to the government, contains substantial evidence to support the convictions.
 
 See Glasser v. United States,
 
 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).
 

 Federal law defines money laundering as “a monetary transaction in criminally derived property that is ... derived from specified unlawful activity,” 18 U.S.C. § 1957(a); such activity includes concealment of assets in bankruptcy.
 
 See
 
 18 U.S.C. § 1956(c)(7)(D) (1994 & Supp. IV 1998); 18 U.S.C. § 152. The plain language of the money laundering statute thus requires that the funds involved in the forbidden “monetary transaetion[s]” represent the proceeds of “specified unlawful activity.”
 

 In enacting the statute, Congress expressed concern about criminals’ use of “complex schemes to disguise the illegal nature and true source” of the proceeds of their illegal activity.
 
 See
 
 S.Rep. No. 99-433 at 2 (1986). The legislative history indicates that “Congress passed the money laundering statutes to criminalize the means criminals use to cleanse their ill-gotten gains.”
 
 United States v. Savage,
 
 67 F.3d 1435, 1441 (9th Cir.1995).
 

 In other words, Congress did not fashion the money laundering statute to create a new source of criminal liability for every fraudulent monetary transaction. Rather, “both the plain language of § 1957 and the legislative history behind it suggest that Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity.”
 
 See Johnson,
 
 971 F.2d at 569 (reversing certain money laundering convictions). To provide the basis for a money laundering offense, a financial transaction must involve funds that have been “criminally derived.”
 

 Funds are “criminally derived” if they are “derived from an already completed offense, or a completed phase of an ongoing offense.”
 
 United States v. Conley,
 
 37 F.3d 970, 980 (3d Cir.1994);
 
 see also Sayakhom,
 
 186 F.3d at 943 (finding that receipt of funds in response to fraudulent mailing could support money laundering conviction when initial .fraudulent mailing formed completed phase of the offense);
 
 Morelli
 
 169 F.3d at 806-07 (finding that first set of fraudulent wire transfers was not money laundering but that subsequent wire transfers involved proceeds of the first set of transfers, and therefore did constitute money laundering);
 
 Christo,
 
 129 F.3d at 580-81 (reversing money laundering conviction when “withdrawal of funds charged as money laundering was one and the same as the underlying criminal activity of bank fraud
 
 *830
 
 and misapplication of bank funds”);
 
 Savage,
 
 67 F.3d at 1441 (holding that money laundering involves “funds obtained from prior, separate criminal activity”). Put plainly, the laundering of funds cannot occur in the same transaction through which those funds first become tainted by crime.
 

 This conclusion does not assist Butler, however. At trial, the government introduced evidence from which a jury could conclude that Butler engaged in the concealment of assets from the bankruptcy trustee almost immediately upon receipt of the settlement proceeds from the Showells. At latest, the funds at issue in the five money laundering counts became “criminally derived property” — property derived from Butler’s bankruptcy fraud — when Butler passed the $150,000 check from the Showell settlement to Father Miller in October 1991. Thus, by September 1992, when Butler began directing the purchase of the cashier’s check in question, the transfer of funds to Father Miller was a “completed phase of an ongoing offense,”
 
 Conley,
 
 37 F.3d at 980; with Father Miller’s apparently unwitting assistance, Butler had managed to conceal these funds from the bankruptcy trustee and his creditors for nearly a year. As a result, when Butler, from September 1992 to early 1993, used these funds to purchase the five cashier’s checks, he was “engaging] in a monetary transaction in criminally derived property,” i.e., property derived from bankruptcy fraud.
 
 See
 
 18 U.S.C. § 1957(a).
 

 At oral argument, Butler’s counsel contended that the government had not argued to the jury that any acts of asset concealment constituting bankruptcy fraud had occurred aside from the five transactions also alleged to be money laundering. Butler stressed the fact that the government, during closing argument at trial, characterized those five transactions as “the most profound acts of concealment.” Earlier in jury argument, however, the prosecutor clearly described Butler’s activities in October 1991, immediately after the Rhema-Showell settlement, as “the beginning of all of these means of concealment,” and further argued that Butler “secreted” the $150,000 check with Father Miller prior to the purchase of the five cashier’s checks.
 

 After careful review of the record, we are satisfied that the government presented the jury with sufficient evidence to support the conclusion that, at the time Butler ordered the purchase of each of the five cashier’s checks, he had completed a phase of the bankruptcy fraud. The five transactions that form the basis for the money laundering counts were thus transactions in “criminally derived property.”
 
 [2]
 

 III.
 

 Additionally, Butler maintains that the government’s use at his criminal trial of testimony he gave during a 1995 civil contempt proceeding constitutes reversible error. The bankruptcy court held Butler in. contempt for his failure to account for the proceeds of the Rhema-Showell settlement; and the district court subsequently allowed Butler to purge himself of contempt by either “(a) paying over the $350,-000 to the Trustee, or (b) subjecting [himself] to examination under oath, in open court, for the purpose of specifically disclosing all information relating to disposition of the settlement funds.... ” Butler ultimately chose to testify. He now contends that this testimony, given under threat of incarceration for civil contempt, was “compelled” in violation of his Fifth Amendment privilege against self-incrimination, and that this “compelled testimony” was improperly admitted into evidence at his criminal trial. Brief of Appellant at 24.
 

 
 *831
 
 Butler’s argument requires us to determine the legal status of his 1995 civil contempt testimony; we review de novo the district court’s admission of that testimony at Butler’s criminal trial, over Butler’s assertion of privilege.
 
 See Hawkins v. Stables,
 
 148 F.3d 379, 382 (4th Cir.1998). Given the relevant facts as to how and when Butler asserted his Fifth Amendment privilege, his argument must fail.
 

 In November 1991, the bankruptcy court, in response to an emergency motion filed by Butler’s attorney, ordered Butler to turn over the $350,000 from the Rhema-Showell settlement. After he failed to do so, the bankruptcy court issued an enforcement order in April 1992 and found Butler to be in civil contempt on June 2, 1992. Two years later, the bankruptcy court granted the sanction of incarceration against Butler for his failure to comply. On appeal, the district court held hearings in November 1994 and March 1995. Butler invoked the Fifth Amendment for the first time during the June 1994 hearing before the bankruptcy court, 31 months after the bankruptcy court first ordered him to turn over the Rhema-Showell settlement proceeds and 24 months after the bankruptcy court held him in contempt for failing to do so.
 

 The bankruptcy court’s April 1992 order enforcing the November 1991 turnover order was final and appealable.
 
 See Smith v. Revie (In
 
 re
 
 Moody),
 
 817 F.2d 365, 367-68 (5th Cir.1987). The enforcement order necessarily contained a finding that, at the time the order was issued, Butler possessed the ability to account for the $350,-000 — a finding that Butler did not appeal, or even, apparently, contest. Two years later, in 1994, when Butler first invoked the Fifth Amendment, it was far too late for Butler to seek “reconsideration [of] the legal or factual basis of the order alleged to have been disobeyed.”
 
 Maggio v. Zeitz,
 
 333 U.S. 56, 69, 68 S.Ct. 401, 92 L.Ed. 476 (1948)
 
 (quoted in United States v. Rylander,
 
 460 U.S. 752, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983)). Butler could not argue in 1994, let alone at the hearing in 1995, which afforded him the opportunity to purge himself of civil contempt, that he had not possessed the $350,000 in 1992, or that the 1992 enforcement order was otherwise invalid.
 

 Rather, Butler’s only available defense at the 1995 contempt hearing, when he was facing incarceration for his long-term refusal to comply with the turnover order and the subsequent contempt order, was to assert “a
 
 present
 
 inability to comply with the order in question.”
 
 Rylander,
 
 460 U.S. at 757, 103 S.Ct. 1548. Butler could seek to show only that he did not presently possess the funds to comply with the turnover order. As the Supreme Court explained in
 
 Rylander,
 
 “[w]here compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action. It is settled, however, that in raising this defense, the defendant has a burden of production.”
 
 Id.
 
 Thus, in order to purge himself of civil contempt, Butler had to meet the burden of producing evidence that he presently lacked the funds to comply with the turnover order.
 

 The Supreme Court’s holding in
 
 Rylan-der
 
 clearly forecloses Butler’s contention that the testimony he gave to meet this burden was “compelled” in violation of the Fifth Amendment. The defendant in
 
 Ry-lander,
 
 facing incarceration for his failure to turn over records that had been subpoenaed by the IRS, had spught to avoid cross-examination in a civil contempt proceeding as to his inability to produce those records. The Supreme Court rejected the argument that requiring the defendant to testify under those circumstances was “a form of ‘compulsion’ which requires that the burden be shifted from the defendant’s shoulders to that of the government.”
 
 Id.
 
 at 758, 103 S.Ct. 1548;
 
 cf. In re Grand Jury Subpoena Dated April 9, 1996 v. Smith,
 
 87 F.3d 1198, 1202 n. 3 (11th Cir.1996) (distinguishing
 
 Rylander,
 
 and permitting invocation of the Fifth Amendment, when defendant asserted her
 
 *832
 
 inability to comply with a subpoena at the enforcement stage, rather than in contempt proceedings).
 

 To avoid incarceration for civil contempt, Butler had to produce evidence demonstrating his present inability to turn over the $350,000. Instead of meeting this burden, he initially attempted to do precisely what the Supreme Court in
 
 Rylander
 
 held a defendant cannot do: assert inability to comply with a court order, while at the same time refusing to answer any further questions on the issue through the invocation of his Fifth Amendment privilege. The district court in the contempt proceeding, citing
 
 Rylander,
 
 correctly denied Butler this option.
 

 True, Butler found himself in a difficult position during the civil contempt proceedings. He faced the prospect of incarceration if he refused to account for the settlement proceeds; he feared that he would incriminate himself if he did testify. This pressure does not amount to “compulsion” under the Fifth Amendment, however. In
 
 Rylander,
 
 the Court likened the defendant, who faced a dilemma similar to Butler’s, to a criminal defendant who must call witnesses or take the stand himself in order to support an alibi defense.
 

 When [the defendant] presents his witnesses, he must reveal their identity and submit them to cross-examination which in itself may prove incriminating or which may furnish the State with leads to incriminating rebuttal evidence.
 
 That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination.
 
 The pressures generated by the State’s evidence may be severe but they do not vitiate the defendant’s choice to present an alibi defense and witnesses to prove it, even though the attempted defense ends in catastrophe for the defendant. However “testimonial” or “incriminating” the alibi defense proves to be, it cannot be considered “compelled” within the meaning of the Fifth and Fourteenth Amendments.
 

 Rylander,
 
 460 U.S. at 759, 103 S.Ct. 1548 (quoting
 
 Williams v. Florida,
 
 399 U.S. 78, 83-84, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970)). Butler’s 1995 testimony, with which he successfully purged himself of civil contempt, likewise cannot be viewed as “compelled.”
 
 See also Gniotek v. City of Philadelphia,
 
 808 F.2d 241, 245-46 (3d Cir.1986) (finding no violation of Fifth Amendment when police officers, faced with evidence of corruption that constituted grounds for dismissal from their jobs, were dismissed after they refused to testify at a predeprivation hearing).
 

 At oral argument, Butler focused his challenge on the alternative ruling of the district court in the contempt proceeding that, even if a witness in Butler’s position ordinarily could invoke the Fifth Amendment, Butler had waived the privilege by submitting an affidavit attesting to his present economic status and inability to pay the $350,000. In
 
 Rylander,
 
 the Supreme Court specifically refused to reach a similar waiver question. 460 U.S. at 761 n. 2, 103 S.Ct. 1548. We, too, need not reach the question of whether Butler waived his Fifth Amendment privilege.
 

 We note, however, that this is not a case in which a party, seeking to avoid the sanction of contempt at the
 
 enforcement
 
 stage of a judicial order, submitted evidence as to inability to comply with the order. Finding such conduct to constitute a waiver of the privilege would, as the Eleventh Circuit has recognized, “create an intolerable result, placing [the party] in the position of remaining silent and being held in contempt for failing to produce the [evidence] that she did not have, or saying that she did not have the [evidence] and then being ordered to testify.”
 
 In re Grand Jury Subpoena,
 
 87 F.3d at 1204 (finding no waiver of privilege).
 

 By contrast, in this case Butler did not attempt to testify at the enforcement stage of the turnover order under the protection
 
 *833
 
 of his Fifth Amendment privilege. Rather, he ignored the turnover order and was held in contempt for doing so. To purge himself of contempt, he had to produce evidence of his inability to comply with the turnover order. His submission of an affidavit did not meet that burden; his testimony did. Butler made a difficult choice to testify rather than be incarcerated for civil contempt, but the severity of his dilemma did not transform his testimony at the contempt proceeding into “compelled” testimony for purposes of the Fifth Amendment.
 
 See Rylander,
 
 460 U.S. at 758, 103 S.Ct. 1548. For this reason, nothing prevented the government from using Butler’s prior testimony in the subsequent criminal case.
 
 See
 
 Fed.R.Evid. 801(d)(2);
 
 Harrison v. United States,
 
 392 U.S. 219, 222, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) (finding defendant’s statements at former trial admissible when not obtained in violation of Fifth Amendment). Accordingly, the district court did not err in permitting the introduction of this testimony at Butler’s criminal trial.
 

 IV.
 

 Finally, Butler argues that the district court erred in refusing to instruct the jury regarding his asserted rebanee on the advice of counsel during the course of conduct that led to his conviction. Butler contends that, among the many attorneys who gave him advice during the relevant time period, at least one gave him advice so erroneous that it negated his intent to commit the crimes for which he was convicted.
 

 The essential elements of the reliance-on-counsel defense are “(a) full disclosure of all pertinent facts to an expert, and (b) good faith reliance on the expert’s advice.”
 
 United States v. Miller,
 
 658 F.2d 235, 237 (4th Cir.1981). After reviewing the record, we find no evidence that would entitle Butler to an instruction regarding reliance on the advice of counsel in the context of any of his relevant interactions with attorneys.
 

 V.
 

 For the foregoing reasons, Butler’s convictions and sentence are
 

 AFFIRMED.
 

 [1]
 

 . The government maintains that Butler has waived this argument by his failure to challenge either the indictment or the jury instructions.
 
 See
 
 Fed.R.Crim.P. 12(f) and 30. Butler disclaims any intent to challenge either the indictment or jury charge; he contends that he is relying on a “legal defect” in the evidence. Reply Brief at 2. Although there is some support for the view that Butler's argument constitutes a challenge to the indictment,
 
 see United States v. West,
 
 22 F.3d 586, 590 n. 11 (5th Cir.1994), most courts have regarded similar arguments as challenges to the sufficiency of the evidence.
 
 See United States v. Sayakhom,
 
 186 F.3d 928, 942-43 (9th Cir.1999);
 
 United States v. Morelli,
 
 169 F.3d 798, 802-03 (3d Cir.1999);
 
 United States v. Christo,
 
 129 F.3d 578, 579 (11th Cir.1997);
 
 United States v. Johnson,
 
 971 F.2d 562, 566-67 (10th Cir.1992);
 
 see also United States v. Levine,
 
 970 F.2d 681, 685-86 (10th Cir.1992) (viewing argument as challenge both to the indictment and to the sufficiency of the evidence).
 

 [2]
 

 . In view of our holding on this issue, we need not, as Butler concedes, address his contention that the district court improperly found for sentencing purposes that he concealed the entire $350,000 from the bankruptcy trustee, rather than only a portion of these funds.