# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00087-CR

**Thomas Dale DeLay, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
NO. D-1-DC-05-904161, HONORABLE WAYNE PATRICK PRIEST, JUDGE PRESIDING**

---

## O P I N I O N

Appellant Thomas Dale DeLay appeals from judgments convicting him of the offenses of money laundering of funds of $100,000 or more and conspiracy to commit money laundering of funds of $100,000 or more. *See* Tex. Penal Code §§ 15.02, 34.02.[1] The predicate offense to support the money laundering conviction was a felony Election Code violation. *See* Tex. Elec. Code. § 253.003. Because we conclude that the evidence was legally insufficient to sustain DeLay's convictions, we reverse the judgments of the trial court and render judgments of acquittal.

## BACKGROUND

The State's charges against DeLay stem from a series of political transactions during the 2002 election cycle. *See generally Ex parte Ellis*, 279 S.W.3d 1 (Tex. App.—Austin 2008),

---

[1] All citations to the Texas Penal and Election Codes are to the version of the codes as they existed in 2002.

*aff'd*, 309 S.W.3d 71 (Tex. Crim. App. 2010) (describing factual basis of indictments against defendants). Texans for a Republican Majority (TRMPAC), a Texas general-purpose political committee, received donations from corporations in excess of $190,000.[2] *See* Tex. Elec. Code § 251.001(14) (defining general-purpose committee). Out of its bank account in which it deposited the corporate funds, TRMPAC issued a check to the Republican National State Elections Committee (RNSEC), a nonfederal component of the Republican National Committee, in the amount of $190,000. Approximately two weeks later, RNSEC issued checks to seven Texas candidates in the cumulative amount of $190,000. RNSEC deposited the check from TRMPAC into an account that included corporate money ("soft money" account) and funded the payments to the seven candidates out of a bank account that did not include corporate money ("hard money" account).[3] RNSEC did not transfer funds between these two accounts. The parties at times described this type of exchange, exchanging soft money for hard money, as a money "swap."[4]

Based on this combination of transactions, DeLay, together with co-defendants John Colyandro and James Ellis, was initially indicted for conspiracy to violate provisions of the Election

---

[2] The evidence at trial was that TRMPAC raised over $500,000 from corporations during the 2002 election cycle.

[3] An accountant for TRMPAC testified at trial that "hard" dollars are "contributions from individuals or entities that are comprised of individuals" and "soft dollars are contributions from corporations or entities that have corporations" as any part of them. TRMPAC maintained separate accounts for hard and soft money.

[4] *See* Paul Frymer & Albert Yoon, *Political Parties, Representation, and Federal Safeguards*, 96 Nw. Univ. L. Rev. 977, 998, 1009–10 (Spring 2002) (defining and discussing role of soft and hard money in elections and practice of transferring soft money for hard money between national parties and state and local parties).

Code and for conspiracy to commit money laundering.[5] The State accused the defendants of "participating in a scheme to channel unlawful corporate political contributions to candidates for the Texas House of Representatives in 2002." *See Ex parte Ellis*, 279 S.W.3d at 1. The trial court quashed the Election Code-based conspiracy charges, and the Texas Court of Criminal Appeals ultimately affirmed the trial court's ruling. *State v. Colyandro*, 233 S.W.3d 870, 870–71, 885 (Tex. Crim. App. 2007). DeLay was then re-indicted on two counts, criminal conspiracy to commit money laundering of funds of $100,000 or more and money laundering of funds of $100,000 or more.[6] The predicate offense for the State's money laundering charge alleged the "offense of knowingly making a political contribution in violation of Subchapter D of Chapter 253 of the Election Code." *See* Tex. Elec. Code §§ 253.003(a) ("A person may not knowingly make a political contribution in violation of this chapter."); .091–.101 (Subchapter D).

The jury trial occurred in November 2010.[7] Calling over 40 witnesses, the State presented evidence concerning the political transactions that formed the basis of its charges, DeLay's involvement with TRMPAC, RNSEC, and the transactions, and his political motivations for obtaining a Republican majority in the Texas Legislature. As TRMPAC's name suggests, it was formed for the purpose of supporting Republican candidates and to gain a Republican majority in

---

[5] Both Colyandro and Ellis were involved with TRMPAC; Colyandro was its executive director.

[6] Ellis and Colyandro were also re-indicted, but their trials have not yet occurred.

[7] Ellis and Colyandro filed pretrial habeas corpus applications involving constitutional challenges to the money laundering statutes and certain Election Code provisions relating to corporate contributions. *See generally Ex parte Ellis*, 309 S.W.3d 71 (Tex. Crim. App. 2010). The Court of Criminal Appeals found the challenged statutes facially constitutional. *See id.* at 81, 90, 92.

the Texas Legislature. DeLay was a board member and raised funds for TRMPAC. DeLay sought a majority in the Texas Legislature in part to accomplish redistricting to increase the Republican delegation to the United States Congress.

The State's theories included that the corporate donations to TRMPAC and DeLay's "agreement" with others to the money "swap," as described above, were unlawful corporate political contributions in violation of the Election Code. *See id.* §§ 251.001(1) (defining "contribution"), 253.003(a) (prohibiting political contributions in violation of Chapter 253), 253.094(a) (prohibiting corporate contributions unless authorized by Subchapter D). It was the State's position that corporations contributed money to TRMPAC and that TRMPAC transferred funds to RNSEC "with the intent that [the funds] be used in connection with" a Texas campaign for elective office, *see id.* § 251.001(3) (defining "campaign contribution"), and that the Election Code prohibited them from doing so. Based on these alleged Election Code violations, the State contended that the corporate funds were "dirty"—i.e., the "proceeds of criminal activity"—and, therefore, the transfer of "dirty" funds from TRMPAC to RNSEC and then the subsequent transfer from RNSEC to Texas candidates of "clean" funds constituted money laundering. *See* Tex. Penal Code § 34.02(a) (elements of money laundering).

DeLay did not dispute any of the transfer-of-funds transactions or that the Election Code prohibited corporations from making campaign contributions to Texas candidates. DeLay's defensive theory, among others, was that none of the transfers was illegal—that they were structured to comply with the campaign finance laws—and, therefore, there were no proceeds of criminal activity to support money laundering or the conspiracy to commit money laundering. He contended

4

that trading soft money for hard money was legal and commonly done by both political parties at that time. He also disputed his level of involvement in the transactions at issue.

The jury returned a verdict of guilty on both counts, and the trial court assessed DeLay's punishment at confinement in the penitentiary for three years on count one and five years on count two. The sentence for the second count was suspended and DeLay was placed on community supervision for ten years.

## ANALYSIS

DeLay raises eight points of error. In his first and second points of error, he contends that the evidence was legally insufficient to support the jury's verdicts as to either count.[8]

**Legal Sufficiency of the Evidence**

Federal due process requires that the State prove every element of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011). When reviewing the sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim App. 2010).

---

[8] His remaining points of error complain about errors in the jury charge, allege improper jury argument, and raise constitutional challenges to certain Election Code provisions and the money laundering statute.

5

We measure the sufficiency of the evidence by the elements of the offense as defined in a hypothetically correct jury charge. *Cada v. State*, 334 S.W.3d 766, 773 (Tex. Crim. App. 2011); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Byrd*, 336 S.W.3d at 246 (quoting *Malik*, 953 S.W.2d at 240).

In assessing the legal sufficiency of the evidence, we have a duty "to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010). "If the evidence establishes precisely what the State has alleged, but the acts that the State has alleged do not constitute a criminal offense under the totality of the circumstances, then that evidence, as a matter of law, cannot support a conviction." *Williams*, 235 S.W.3d at 750.

**Offenses of Conspiracy and Money Laundering**

Section 15.02 of the Penal Code, criminal conspiracy, provides in relevant part:

(a)    A person commits conspiracy if, with intent that a felony be committed:

    (1)    he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and

6

(2)      he or one or more of them performs an overt act in pursuance of the agreement.

Tex. Penal Code § 15.02(a); *Williams v. State*, 646 S.W.2d 221, 222 (Tex. Crim. App. 1983) (describing elements of conspiracy offense).

As alleged in this case, a person commits the offense of money laundering "if the person knowingly . . . conducts, supervises, or facilitates a transaction involving the proceeds of criminal activity." Tex. Penal Code § 34.02(a)(2). "Proceeds" are defined to mean "funds acquired or derived directly or indirectly from, produced through, or realized through an act." *Id*. § 34.01(4). "Criminal activity" includes any offense classified as a "felony." *Id*. § 34.01(1).

**Allegations and Proof**

Count one, the criminal conspiracy allegation, reads:

> [O]n or about and between the sixth day of September, 2002, and the fourth day of October, 2002, . . .the defendants . . . with intent that a felony be committed, to wit, with intent that the offense of money laundering of funds of the value of $100,000 or more, a felony of the first degree, be committed, did agree with one or more persons, namely, John Dominick Colyandro, . . . James Walter Ellis, . . . Thomas Dale DeLay . . . Texans for a Republican Majority PAC . . . and the Republican National Committee . . . that they or one or more of them engage in conduct that would constitute the aforesaid offense, and the defendant, John Dominick Colyandro, James Walter Ellis, and the Republican National Committee, did perform an overt act in pursuance of the agreement, to wit: . . . .

The indictment listed 13 overt acts:

1.      On or about September 10, 2002, Colyandro signed the check for $190,000 payable to RNSEC from TRMPAC.

7

2.  On or about September 10, 2002, Colyandro delivered the check to an accountant for TRMPAC.

3.  On or about September 10, 2002, Colyandro instructed the accountant to send the check to Ellis.

4.  On or about September 11, 2002, Ellis communicated with the chief of staff of the RNC and did "request and propose that, in exchange for their receipt of a contribution of a certain sum of money" from TRMPAC, the RNC and RNSEC would "make political contributions to seven candidates for the Texas House of Representatives that were supported by" TRMPAC.

5.  On or about September 13, 2002, Ellis tendered and delivered the check to RNC.

6.  On or about September 13, 2002, Ellis provided the chief of staff of the RNC with a document that contained the names of seven Texas candidates that were supported by TRMPAC with "suggested" amounts of contributions and Ellis "requested and proposed" that the RNC and RNSEC "make political contributions in exchange for the committees' receipt of the proceeds from the aforesaid check."

7-13.  On or about October 4, 2002, the RNC and RNSEC issued checks in specified amounts to the campaigns for the seven candidates.


The check from TRMPAC to RNSEC was included as an exhibit to the indictment.

Count two, the money laundering allegation, specifically alleged in relevant part:

[The defendants] did knowingly conduct, supervise, and facilitate a transaction involving the proceeds of criminal activity that constituted an offense classified as a felony under the laws of this state, to wit, the offense of knowingly making a political contribution in violation of Subchapter D of Chapter 253 of the Texas Election Code, a felony violation of chapter 253.003 of the Election Code; that the aforesaid transaction consisted of the transfer of funds of the aggregate value of $190,000 from the [RNC] and the [RNSEC] . . . to several candidates for the Texas House of Representatives that were supported by [TRMPAC].

The count further alleged that the defendants "conducted, supervised, and facilitated the aforesaid transaction by":

1.    "negotiating with" RNC's chief of staff "for an agreement, arrangement, and understanding whereby [TRMPAC] would make a contribution of a certain sum of money to the [RNC] and [RNSEC] and whereby the [RNC] and [RNSEC] would make contributions to the aforesaid candidates;"

2.    "providing" RNC's chief of staff "with certain information concerning contributions to be made by the [RNC] and [RNSEC] to the said candidates, to wit, the names of said candidates and amounts that [TRMPAC] suggested be contributed to each of the said candidates;"

3.    "signing the check reproduced at the conclusion of this count;"

4.    "transferring funds of the value of $190,000 from [TRMPAC] to [RNC] and [RNSEC]; . . . ."

The count also alleged that "the value of the funds that constituted the aforesaid proceeds of criminal activity was $100,000 or more" and included a copy of the same check from TRMPAC payable to RNSEC as was included with count one.

As drafted, both counts of the indictment required the State to establish that there was a felony criminal offense which generated proceeds. *See* Tex. Penal Code §§ 15.02, 34.02. The State asserted that the underlying or predicate criminal offense was the violation of Chapter 253, Subchapter D, of the Election Code, specifically section 253.003. *See* Tex. Elec. Code § 253.003(a), (e) (making it third degree felony if person "knowingly makes a political contribution" in violation of Subchapter D). A political contribution is defined to include "a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office." *Id*. § 251.001(3), (5). A contribution is defined as "a direct

or indirect transfer of money . . . and includes an agreement made . . . , whether legally enforceable or not, to make a transfer." *Id*. § 251.001(2). "[A] payment or transfer to a campaign or political committee is not a 'political contribution'—and therefore, not regulated by the election code at all—if it is not 'offered or given with the intent that it be used in connection with a campaign for elective office or on a measure." *Ex parte Ellis*, 279 S.W.3d at 9.

Though not asserted at trial, the State urges on appeal that the corporate payments to TRMPAC violated the Election Code because most of the donations were given without designating a particular use for the donation or were given with the intent that they be used in connection with a Texas campaign. Although most of the corporate donations to TRMPAC did not include a specific designation or limitation on how TRMPAC used the funds, witnesses from the corporations that gave money to TRMPAC uniformly testified that they intended to comply with the law and that they made their respective donations with the intent that they be used for lawful purposes.[9] *See Ex parte Ellis,* 309 S.W.3d 71, 90 (Tex. Crim. App. 2010) (noting requirement in Election Code "that a contributor have a certain intent before the contribution is deemed illegal").[10] "The State has the

---

[9] The evidence at trial was that the corporations primarily gave money to TRMPAC to show their support of DeLay. Most of the corporate representatives also testified that they hoped to have the opportunity to have "face time" with DeLay to discuss policy, educate him on their particular issues of concern, and build a relationship with him.

[10] In that case, the Texas Court of Criminal Appeals was addressing subsection (b) of 253.003, as well as other sections of the Election Code. *See Ex parte Ellis*, 309 S.W.3d at 86. Subsection (b) states: "A person may not knowingly accept a political contribution the person knows to have been made in violation of this chapter." Tex. Elec. Code § 253.003(b). Thus, the court was addressing unlawfully accepting a contribution rather than unlawfully making a contribution. In any event, we find the provisions' mens rea requirements are not dissimilar.

burden to prove the applicable culpable mental states, and if it cannot, then a defendant charged under [the Election Code provisions at issue] is entitled to an acquittal." *Id*.

All corporate contributions were deposited in a separate, designated account by TRMPAC. Corporate contributions to a general purpose Texas political committee could lawfully be spent to finance the committee. The State's forensic analyst testified:

> Q. Did you see a single check out of that account that the $190,000 went into to a single candidate in Texas?
>
> A. No.
>
> Q. Furthermore, there were no transfers from that account to the account from which the checks were written to the candidates in Texas, was there?
>
> A. That's correct.
>
> Q. If there's been testimony about a firewall, meaning that there was a strict division between that corporate account where the 190 went and the other account where the checks were written to the Texas candidates came from, that's a fair characterization, isn't it? No transfers between the two, never the money mixed, right?
>
> A. I didn't see transfers between the two accounts.

As the Ethics Advisory Opinion offered into evidence by the State explains, "Contributions that support the operation of a general-purpose committee ultimately support the carrying-out of the committee's principal purposes, including the making of political expenditures in connection with elections and officeholder assistance." *See* Texas Ethics Advisory Opinion 132 (1993).[11] And as

---

[11] Opinion No. 132 was the only Ethics Advisory Opinion admitted in evidence and reviewed by the jury during deliberations. *See* Tex. Ethics Advisory Opinion No. 132 (1993) (Exhibit 155). But Opinion No. 132 relied on Ethics Advisory Opinion No. 32 (1992) for the statement that a

the trial court charge instructed: "The Election Code does not prohibit a corporation from making contributions and expenditures in connection with elections and measures in states other than Texas. A general purpose political committee may use corporate contributions that it receives to make any contribution or expenditure that a corporation could make."

The State does not dispute that the law allowed corporate contributions to general-purpose political action committees for administrative expenses. Practically speaking, lawful corporate contributions to the administration of a committee ultimately support the committee's principal purpose, and funds given for the administration are not transformed into "proceeds of criminal activity" merely because the funds were from corporations. Nor are funds illegal merely because the corporate contributions allowed individual contributions to be used to support candidates.

The State does not contend that the corporations were prohibited from making donations to TRMPAC or that TRMPAC was prohibited from transferring those funds for use out of state. *See* Tex. Ethics Advisory Opinion No. 277 (1995) ("Title 15 of the Election Code does not prohibit a Texas corporation from making contributions and expenditures in connection with

_____

corporation which contributes money to the administration or establishment of a general-purpose committee must be clearly identified in the name of the committee. *See* Tex. Ethics Advisory Opinion No. 132 & n.3 (1993). TRMPAC did not include any corporation's name in its name. At the jury members' request, the judge gave them Opinion No. 132 to read as they deliberated. But the Texas Ethics Commission had reversed its position and overruled Opinion No. 32 in Ethics Advisory Opinion No. 145 (1993), which provides: "A general-purpose committee is not required to include the name of a legal entity in its name simply because the legal entity contributes money for the establishment or administration of the committee." Tex. Ethics Advisory Opinion No. 145 (1993). The jury was not told Opinion No. 32 had been overruled or that the Ethics Commission had reversed its position.

12

elections in other states."); Tex. Ethics Advisory Opinion No. 208 (1994) ("It is clear . . . from the Texas campaign finance laws taken as a whole, that the offices and campaigns referred to are Texas offices and Texas campaigns. . . . Therefore we conclude that the legislature did not intend to require that general-purpose political committees report political expenditures made in connection with out-of-state campaigns, officeholders, or measures."). Given the testimony of the corporate representatives and the undisputed facts that the corporations could lawfully make donations to TRMPAC and TRMPAC could lawfully transfer the corporate funds out of state, the State failed to prove the "applicable culpable mental states" for the donating corporations to support a finding of criminal intent by the corporations.[12] *See Ex parte Ellis,* 309 S.W.3d at 90.

---

[12] The State focuses on brochures, forms, and letters by TRMPAC soliciting donations. TRMPAC's statements in brochures, forms, and letters included the following:

- TRMPAC is focused on raising and giving funds directly to Republican candidates for state house, state senate, and potentially all statewide offices.

- Your support today will go directly to help Republican candidates in Texas successfully run and win their campaigns.

- All contributions, whether to the PAC or individuals, will be used for direct campaign expenses.

- Unlike other organizations, your corporate contribution to TRMPAC will be put to productive use. Rather than just paying for overhead, your support will fund a series of productive and innovative activities designed to increase our level of engagement in the political arena.

However, we note that these materials solicited donations from individuals as well as corporations. In addition, these statements by TRMPAC address TRMPAC's intentions, not the corporations' intentions. The corporate representatives testified that they assumed that their donations would be used for lawful purposes and, as previously stated, that they sought to support DeLay and hoped to obtain access to DeLay.

13

To support its position that the majority of corporate contributions violated the Election Code by not expressly designating a lawful use of their donations to TRMPAC, the State focuses on the following clause from the opinion in *Ex parte Ellis*: "there is no such thing as a legal undesignated corporate political contribution." *Id*. at 88. We believe that the State takes this clause out of context. In that case, the court was addressing constitutional challenges to the Election Code. The clause cited by the State was made during the court's examination of section 253.100, the section of the Election Code addressing the establishment of a general-purpose committee by a corporation and in response to a possible suggestion made by this Court. The Court of Criminal Appeals stated:

> To the extent that the court of appeals may have suggested that there is no such thing as an undesignated corporate political contribution, the error it made was minor. It would be more accurate to say that there is no such thing as a legal undesignated corporate political contribution. Individuals can legally make undesignated political contributions, but corporations cannot. A corporation must designate the purpose of the political contribution by contributing to a political committee that is exclusively devoted to measures, by making expenditures for maintenance or operation of a corporate political committee, or by contributing to a political party under certain narrowly defined conditions.

*Id*. We also note that, although the Election Code prohibits a corporation from making contributions unless authorized by Subchapter D, it does not require a corporation to report or expressly designate the uses that it authorizes when making a donation. *See generally* Tex. Elec. Code §§ 253.091–.104; *Spence v. State*, 325 S.W.3d 646, 650 (Tex. Crim. App. 2010) (focusing on "literal text to determine the objective meaning of that text at the time of its enactment" when interpreting statutes); *see also State v. Rhine*, 297 S.W.3d 301, 309 (Tex. Crim. App. 2009) (quoting *State v. Johnson*,

14

219 S.W.3d 386, 388 (Tex. Crim. App. 2007), for principle that "criminal statutes outside the penal code must be construed strictly, with any doubt resolved in favor of the accused").

The State's primary argument at trial was that the Election Code violation that generated criminal proceeds was the "agreement" between DeLay and others to the combined transfers of funds, i.e., the money swap of soft money for hard money. The State argued in its final argument: "[T]he moment that the decision was made to send the soft dollar check up to Washington D.C. with the intent that it ultimately go to candidates for elective office is the moment that this money became proceeds of criminal activity."[13] Relying on the use of the word "indirect" in the Election and Penal Code statutes at issue, the State argues that the "agreement" to the combined transactions itself was an illegal contribution and thus the corporate funds sitting in TRMPAC's bank account at the moment of the agreement became the proceeds of criminal activity. *See* Tex. Elec. Code § 251.001(2) (defining "contribution" to include "indirect transfer of money" and "agreement . . . to make a transfer"). However, the State fails to explain how the funds already in the bank account resulted from the subsequent money-swap agreement. *See* Tex. Penal Code § 34.01(4) (defining "proceeds" to include "funds acquired or derived directly or indirectly from, produced through, or realized through . . . an act"). Further, to support this argument, the State disregards the distinction between soft and hard money accounts as irrelevant, arguing: "The fact that the funds were not commingled is simply irrelevant in light of the explicit one-for-one exchange which was negotiated in this case." But in the context of the campaign finance regulations,

---

[13] In its brief, the State urges: "The funds [criminal proceeds] themselves were the corporate money held in TRMPAC's 'soft money' account, which became criminal when TRMPAC struck a deal with the RNSEC to exchange the money for contributions directly to Texas candidates."

maintaining separate, segregated bank accounts for soft and hard money is recognized and accepted as legitimate. *See, e.g.*, 11 C.F.R. 102.5 (authorizing "organizations financing political activity in connection with Federal and non-Federal elections" to maintain separate bank accounts for hard and soft money); *EMILY's List v. Federal Election Comm'n*, 581 F.3d 1, 12–13, 17–18 (D.C. Cir. 2009) (discussing distinction and authorization of hard and soft money accounts in context of hybrid non-profit); *Carey v. Federal Election Comm'n*, 791 F.Supp. 2d 121, 125, 131–32 (D.D.C. 2011) (discussing distinction and authorization of "separate" hard and soft money accounts in context of federal political action committee and concluding that "maintaining two separate accounts is a perfectly legitimate and narrowly tailored means to ensure no cross-over between soft and hard money").

Here, the evidence was undisputed that the RNSEC issued checks to the seven Texas candidates from a hard money account that was separate from its soft money account.[14] Thus, the sources of the funds in the hard money account were not "indirectly" from corporations but from sources such as individuals who were not prohibited from making campaign contributions.[15] *See EMILY's List*, 581 F.3d at 12 & n.11 (describing allowed sources of funds in soft and hard money accounts and noting that corporate donations may not be placed in hard money account). As to the funds that were transferred from TRMPAC to RNSEC, the Election Code does not prohibit corporate

---

[14] The State's forensic analyst who reviewed the records of TRMPAC and RNSEC acknowledged that the $190,000 to the Texas candidates was from a separate, non-corporate RNSEC account.

[15] A witness who worked for the Republican party testified that the average personal donation to the Republican party was "probably about $80," that the accounts with corporate money and personal money were "firewalled off from each other," and that the corporate funds sent by TRMPAC to RNSEC did not come back to Texas.

16

funds from being sent out of Texas, RNSEC placed the funds in a soft money account, and RNSEC's accounts were not commingled. *See id.*; *see also* Tex. Ethics Advisory Opinion Nos. 208, 277.[16]

We also question the validity of the State's "agreement" theory. It was not a crime to conspire to violate the Election Code in 2002. *See Colyandro*, 233 S.W.3d at 870–71, 885. And, even if it was, the evidence does not support a finding that there was an "agreement" to illegally transfer corporate money to Texas candidates. There was no evidence that TRMPAC or RNSEC treated the corporate funds as anything but what they were, corporate funds with limited uses under campaign finance law. Rather, when viewed in the light most favorable to the verdict, the evidence showed an agreement to two legal monetary transfers: that TRMPAC transfer corporate money to RNSEC for use in other states and not in Texas in exchange for RNSEC transferring funds to Texas candidates out of a hard money account. Rather than supporting an agreement to violate the Election Code, the evidence shows that the defendants were attempting to comply with the Election Code limitations on corporate contributions.

Further, the State's "agreement" theory depends upon the combination of the transactions, conflating the predicate criminal activity, the making of "an agreement . . . to make a transfer" in violation of the Election Code, with the money laundering transaction. *See, e.g.*, *United States v. Harris*, 666 F.3d 905, 908–09 (5th Cir. 2012) (describing money laundering convictions

---

[16] The jury was instructed:

The Election Code does not prohibit a corporation from making contributions and expenditures in connection with elections and measures in states other than Texas.

A general purpose political committee may use corporate contributions that it receives to make any contribution or expenditure that a corporation could make.

17

that failed because, among other reasons, "the unlawful act was not yet complete"); *United States v. Butler*, 211 F.3d 826, 829 (4th Cir. 2000) (noting that federal money laundering statute "targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity" and noting that funds are "criminally derived" if they are "derived from an already completed offense, or a completed phase of an ongoing offense" (citations omitted)); *United States v. Mankarious*, 151 F.3d 694, 706 (7th Cir. 1998) ("[T]he predicate offenses must produce proceeds before anyone can launder those proceeds."); *United States v. Edgmon*, 952 F.2d 1206, 1214 (10th Cir. 1991) ("Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity'. . . . We find that Congress intended money laundering and the 'specified unlawful activity' to be separate offenses separately punishable.").[17]  Money laundering and Election Code violations are different offenses.  The Texas money laundering statute, as applied here, is not simply an alternative means of punishing the alleged predicate offense.  Money laundering is a subsequent offense separate from the alleged criminal activity that is its predicate offense.  *See, e.g.*, *United States v. Christo*, 129 F.3d 578, 579–81 (11th Cr. 1997) (reversing federal money laundering conviction where the "withdrawal of funds charged as money laundering was one and the same as the underlying criminal activity of bank fraud and misapplication of bank funds").  Here, the funds were only "derived from" the money-swap agreement after the transactions were complete, if at all.

---

[17]  The federal money laundering statute was passed "to criminalize the means criminals use to cleanse their ill-gotten gains."  *United States v. Savage*, 67 F.3d 1435, 1441 (9th Cir. 1995).

Finally, even if we were to conclude that the corporate donations to TRMPAC or the agreement itself to the series of money transfers violated the Election Code, the State's charges as stated in the indictment were tied to the transfer from RNSEC to the seven Texas candidates. As stated above, the RNSEC issued the checks to the candidates from a separate, segregated account—a hard money account—which did not include corporate money. *Compare United States v. Loe*, 248 F.3d 449, 466–67 (5th Cir. 2001) (distinguishing "clean" and "dirty" money in same account in context of federal money laundering charges); *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999) ("When money is commingled, 'the illicitly-acquired funds and the legitimately-acquired funds … cannot be distinguished from each other….'" (citation omitted)), *with EMILY's List*, 581 F.3d at 12 & n.11 (recognizing practice of maintaining separate, segregated accounts in context of campaign finance laws). The sources of the funds in RNSEC's hard money account, such as contributions from individuals, were not "tainted." RNSEC deposited the corporate funds of $190,000 in a soft money account and those funds were not commingled with the hard money account or otherwise used in Texas. Thus, the State failed in its burden to prove that the funds that were delivered to the seven candidates were ever tainted. *See* Tex. Penal Code § 34.02(a)(2); *Williams*, 235 S.W.3d at 750 (evidence presented must actually support a conclusion that defendant committed the crime that was charged).

The deficiency of the State's case is illustrated by the confusion displayed by the jury during deliberations. The money laundering statute required the State to prove that the funds involved in the transaction were the "proceeds of criminal activity." *See* Tex. Penal Code § 34.02(a)(2). Essentially, if the funds were not "proceeds of criminal activity," the subsequent

19

transaction was not money laundering. *See, e.g.*, *King v. State*, 254 S.W.3d 579, 580–85 (Tex. App.—Amarillo 2008, no pet.) (holding evidence legally insufficient, and distinguishing case where there was "a nexus between the money and some criminal activity that had previously taken place"); *see also United States v. Butler*, 211 F.3d 826, 830 (4th Cir. 2000) ("Put plainly, the laundering of funds cannot occur in the same transaction through which those funds first become tainted by crime.").

During deliberations, the jury asked the trial judge that question of law in this way: "Can it constitute money laundering if the money wasn't procured by illegal means originally?" The request for an instruction on the law was proper. *See* Tex. Code Crim. Proc. art. 36.27 (The trial court "shall answer any such communication in writing."); *Gamblin v. State*, 476 S.W.2d 18, 20 (Tex. Crim. App. 1972) (The statute "requires the court to answer communications of the jury and give additional instructions upon questions of law when the request is proper."). The proper answer to the question is "no." The jury's question about the law was not answered, however; the court simply referred the jury to the court's charge.

Later, during deliberations, the jury asked the question again: Does the money "have to be illegal at the start of the transaction." Again, the question was a proper one, and the answer to that re-phrasing of the same question is "yes." Otherwise, the funds would not be "proceeds of criminal activity." But the prosecutor argued to the trial judge that the money could be obtained legally and still be laundered. The trial court did not answer the jury's question of law, but once again simply referred the jury to the jury charge that was questioned.

20

While the jury was in the jury room deliberating, the prosecutor, addressing the jury's questions, argued to the trial judge:

> Well, Your Honor, I feel a little bad for the jury because I think it is evident from their questions that they are confused about the law.
>
> . . . .
>
> And they are just expected to be arbitrators of the facts, not the law. And I think we've put them in an uncomfortable position of trying to decide what the law is, which is not their job.

As the prosecutor commented, the jury should not have been placed in the "uncomfortable position of trying to decide what the law is, which is not their job." The jury's questions to the trial judge, along with the prosecutor's argument in response, point to the lack of evidence showing that the funds involved in the transaction were the proceeds of criminal activity. The State did not prove the funds were "illegal at the start of the transaction" or "procured by illegal means originally," as phrased by the jury in the two questions about the law. The lack of legally sufficient evidence that the funds were "proceeds of criminal activity" requires an acquittal.

**CONCLUSION**

Based on the totality of the evidence, we conclude that the evidence presented does not support a conclusion that DeLay committed the crimes that were charged. *See Williams,* 235 S.W.3d at 750; *see also United States v. Grossman*, 117 F.3d 255, 261 (5th Cir. 1997) (concluding that evidence legally insufficient to sustain conspiracy count where evidence was legally insufficient to sustain substantive counts forming basis for object of conspiracy); *United States*

21

*v. Mackay*, 33 F.3d 489, 494 (5th Cir. 1994) ("A conspiracy conviction requires proof of an agreement to commit a crime."). The fundamental problem with the State's case was its failure to prove proceeds of criminal activity. We sustain DeLay's first and second points of error. Due to our resolution of these two grounds, we do not reach DeLay's remaining points of error.

Because we conclude that the evidence was legally insufficient to support DeLay's convictions, we reverse the judgments of the trial court and render judgments of acquittal.

_____

Melissa Goodwin, Justice

Before Chief Justice Jones, Justices Goodwin and Gaultney*;
  Dissenting Opinion by Chief Justice Jones

Reversed and Rendered

Filed:  September 19, 2013

Publish

\*  Before David Gaultney, Justice, Ninth Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(a).

22