

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00178-CR

_____

EX PARTE JORGE VALENZUELA

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CR24490

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

Appellant Jorge Valenzuela was indicted for the offense of indecency with a child by sexual contact. *See* Tex. Penal Code Ann. § 21.11. His jury trial for that offense ended in a mistrial "based upon the misconduct of the lead attorney for the State." Valenzuela then filed an application for writ of habeas corpus asserting that his double-jeopardy rights would be violated by a retrial. After hearing the application, the trial court denied it. This appeal followed.

In a single issue, Valenzuela contends that the trial court abused its discretion by denying habeas relief because the State's misconduct was calculated to avoid an acquittal. We disagree and affirm the trial court's denial of habeas relief.

## I. Background

Valenzuela was a family friend of the complainants, sisters Michelle and Amy.[1] On the night of the alleged offense, he entered the complainants' bedroom and began rubbing Amy's back. He then put his hand underneath Michelle's pants and rubbed her vagina. Michelle pushed his hand away, and he put his hand underneath Amy's pants and touched her "on [her] butt." He stopped touching the complainants when

---

[1]The indictment alleged that Valenzuela had "knowingly engage[d] in sexual contact with [Michelle] by touching the genitals of [Michelle], a child younger than 17 years of age." Additionally, the State alleged an extraneous offense committed against Amy, who was also under the age of 17. Thus, we refer to both Michelle and Amy as complainants.

To protect the complainants' identities, we use aliases for them and for their family members. *See* Tex. R. App. P. 9.8 cmt.; 2nd Tex. App. (Fort Worth) Loc. R. 7; *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

his wife entered the bedroom. Later that night, the complainants told their mother what Valenzuela had done, and the police were called.

## A. Valenzuela's Trial

At trial, Valenzuela was represented by attorney Courtney Miller. The State was represented by assistant district attorney John "Jay" Lapham.

During the State's opening statement, Lapham told the jury the facts of the case and the anticipated evidence and testimony. He described the underlying investigation, the forensic interviews of the complainants, and the physical evidence that had been collected. Specifically, the investigators collected the underwear that had been worn by the complainants during the alleged offense and placed them in separate evidence bags. Samples of Valenzuela's DNA and the complainants' DNA were also collected and compared to DNA found on the underwear.

Lapham explained that Allison Conway, the defense's DNA analysis expert, would testify that there had not been any bodily fluids on the underwear and that the case involved "touch DNA." Lapham told the jury that, while Valenzuela's DNA had not been located on the underwear, Conway would testify that "the absence of that DNA does not mean that [Valenzuela] never touched those girls. . . . It just means his DNA was not located."

During its case in chief, the State called seven witnesses: the complainants' mother as the outcry witness, the complainants, their older sister, the forensic interviewer who interviewed the complainants the day after the alleged offense, the

3

police investigator assigned to the case, and a therapist who treated the complainants after the alleged offense. The State also offered a video of Michelle's forensic interview, which was admitted and played for the jury.

During the State's case, Valenzuela moved for a mistrial twice—once in response to hearsay testimony from the complainants' mother and again after the trial court sua sponte excused a juror under Article 36.29 of the Texas Code of Criminal Procedure. The trial court denied both requests. After the State rested, Valenzuela told the trial court that he would be presenting defense evidence. He did not move for a directed verdict.

Valenzuela called Conway as his first witness. Conway testified about her expertise in DNA analysis and the general process of testing evidence, including testing specifically for male or female DNA. She also explained the difference between DNA derived from bodily fluids and DNA that is transferred from a person's skin cells, or "touch DNA." Regarding her involvement in this case, Conway explained that she had been given DNA samples from the complainants and from Valenzuela and that she had performed a DNA analysis of the complainants' underwear. She testified that no identifiable DNA profile had been developed; that no male DNA had been detected on either pair of underwear; that a major female DNA contributor—likely each of the complainants—had been detected on each respective

4

pair of underwear; and that a minor, unknown female DNA contributor[2] had been detected on one pair of underwear but not the other.

During Conway's testimony, Valenzuela offered, and the trial court admitted, photographs of the evidence bags containing the complainants' underwear. The photographs showed that each evidence bag also contained a rubber glove that had been turned inside out. Other than confirming that Conway had tested the underwear for DNA, Valenzuela did not question her further about the photographs.

Lapham questioned Conway on cross-examination. He asked Conway if she had tested the complainants' underwear in their entirety or if she had tested only specific areas, and she responded that she had tested only certain areas of the underwear. She did not detect any male DNA on the areas tested. Lapham presented Conway with a hypothetical scenario in which a person's DNA may not be detected when the person touched only the skin under the underwear, and Conway confirmed that such a scenario was possible but that she "d[id]n't know specifically what happened in this case." She acknowledged that it is "difficult to develop a DNA profile when there's not much DNA present."

Lapham also questioned Conway about the photographs that had been admitted on direct examination. He asked Conway if the rubber gloves in the evidence bags had come from the evidence lab, and Conway responded that they had

---

[2]The use of "minor" here does not refer to the age of the DNA contributor but to the quantity of DNA present in a mixed DNA profile.

not. When he attempted to clarify whether the police officers who had collected the evidence had used the gloves and dropped them into the bags, Conway testified that it was possible but that she did not know if the gloves had been used or not. The following exchange then occurred:

> [*MR. LAPHAM*:] Okay. So if there was a -- a male that wore those gloves and had -- you probably won't know whether, you know, depending on how the glove fit, if it was snug or not snug --
>
> *MS. MILLER:* I'm going to object to speculation on this whole line of evidence -- this whole line of questioning. It's a whole lot of ifs and buts, candy and nuts.
>
> *MR. LAPHAM:* This is what an expert's for, Your Honor. I get to ask these questions here in cross-examination.
>
> *THE COURT:* I understand. But does -- do the -- do you think the gloves have something to do with the prosecution of this case?
>
> *MR. LAPHAM:* Well, from a standpoint that they have contaminated these particular underwear, another male, and that no other male profile was developed based on somebody wearing gloves and dropping those gloves in the same sack with these underwear.
>
> *MS. MILLER:* Your Honor, I'm going to object to State's counsel saying anything's been contaminated. There's been absolutely no evidence of that, none, and no male DNA found whatsoever. In fact, I'm going to ask for a mistrial at this point in time.
>
> *THE COURT:* Well, I'm going to deny the request for mistrial.

After the trial court denied the mistrial, it gave Lapham an opportunity to make his point, if any, regarding the gloves. Miller requested a jury instruction to disregard any comments by Lapham about contamination, and the trial court instructed the jury accordingly.

Lapham continued his line of questioning about the gloves, asking Conway if it had been the proper procedure to place a glove and underwear in the same evidence bag. Conway testified that the items should have been packaged separately. She explained, "I don't know why the gloves are there. We didn't put them there." Lapham then asked, with no objection from Miller, if cross-contamination would be a concern when other items are placed in an evidence bag. Conway responded that "[t]here could be a transfer between items if they're touching each other." She further explained that "[i]f there were skin cells present on the glove, it's possible they could [have] be[en] transferred to the underwear if they [had been] touching." At that point, Lapham asked, "And, hypothetically, if there was a male that was wearing those particular gloves, then that -- you would expect that profile potentially to show up in your DNA testing, correct?" Miller objected to this question, and the trial court excused the jury from the courtroom.

Outside the presence of the jury, Miller asserted that the State was "deliberately misleading the jury and putting in improper evidence." She then read from the police report, which stated that an investigator had "obtained [the complainants'] clothing for evidentiary purposes," that he had "followed FBI DNA collections procedures," and that he had instructed the complainants' mother to "place the clothing into a paper evidence bag, then remove the gloves utilized in collecting the clothing." Miller told the trial court that there had been "no man's glove" touching the evidence, only "female['s] gloves." Lapham argued that the investigator had not followed the

7

appropriate evidence-collection protocol because "you cannot put a glove from someone else's hands inside an item that's being tested. It's cross-contamination." He claimed that he had "no idea" who had worn those gloves.

Explaining why he pursued the line of questioning, Lapham told the trial court,

[M]y point is there's another pair of gloves -- there's a pair of gloves that have been in this bag since 2022 when this offense happened, rummaging around in here, and it -- there is a possibility that that particular glove could have left DNA, and it's been in there now for a year. And so there was no profile found there, so it is not surprising that the Defendant's brief touch of the child would not leave any DNA either?

When pressed further by the trial court, Lapham admitted that he had not read the police report in preparation for trial. He asserted that he had not anticipated that the DNA "was going to be a big issue" until Conway testified that the gloves had not come from the lab, which, according to Lapham, made it more probable that the evidence had been contaminated. He argued, "My point is[,] yes, there was no DNA found, but there's a glove in there with potentially skin cells that are rubbing up against the[] underwear and that wasn't found either." Valenzuela moved for a mistrial again, and the trial court denied it.

After the trial court denied the mistrial, Miller requested to call the investigator to "get him . . . to testify about the actual process and that he never touched that glove." Lapham indicated that the State had no objection to the request. Miller told the trial court that she had no way of contacting the investigator and that she needed help in doing so, and the trial court responded, "I'm not going to do that. . . . I don't

understand why . . . that should be necessary." Miller then requested to read the police report to the jury, and Lapham objected, stating that it would go to the weight of the evidence and that "[t]he jury can give whatever weight that they choose to give to whether they think that there's some cross-contamination with regard[] to this evidence." At that, the trial court "[c]hanged [its] mind" and decided to grant Valenzuela's mistrial over the State's objection.

**B. The Habeas Hearing**

The trial court also presided over the subsequent habeas hearing, the tone of which bordered on hostile, with the attorneys making passive-aggressive comments, speaking over each other, and repeatedly interrupting the judge. At one point during the hearing, the judge had to remind the attorneys to "maintain their civility," stating that the hearing was a "professional" proceeding, "not a personal one."

Over the State's objection, Miller called Lapham to testify at the hearing. Attempting to point out weaknesses in the State's case, she asked Lapham whether certain testimony from the complainants had "surprise[d]" him, suggesting that there had been inconsistencies in their testimonies. Lapham responded that when children testify about something that happened to them two years before trial, inconsistencies are not surprising. He asserted that any inconsistencies in the complainants' testimonies had been no different than in any other case in which a child victim testifies.

Regarding the evidence collection, Lapham asserted that the police report had been "unclear" as to who wore the gloves contained in the evidence bags. He acknowledged, however, that the officers' body-camera footage from the investigation showed that the complainants' mother had worn the gloves, which he claimed to have realized only when he watched the video footage after trial. When confronted with his statement about a male wearing the gloves, Lapham testified that it had been an "error on [his] part . . . based upon [Miller's] direct examination."[3] He claimed that he had believed the gloves belonged to the lab until Conway testified otherwise. He admitted that he had not reviewed the relevant portions of the police report and body-camera footage pertaining to the evidence collection and that his statement that a male had worn the gloves had been "incorrect."[3] He continued to assert, however, that the evidence had been contaminated, "whether it was [from] male or female," because the gloves should not have been placed inside the evidence bags with the underwear.

---

[3]This testimony was in response to Miller's attempt to get Lapham to agree that he had made a "false statement" in front of the jury. In her attempt, she identified the following statements by Lapham during Conway's cross-examination: "if there was a male that wore those gloves" and "they have contaminated these particular underwear, another male." In the context of the entire exchange that occurred in front of the jury, Lapham's statements could be construed as hypothetical questions posed to an expert witness. *See* Tex. R. Evid. 702. But in conceding that the statements—which were not presented to him in the context of the entire exchange— were an "error" or "incorrect," Lapham apparently believed that the statements were construed by the jury as an assertion that a male had worn the gloves. For purposes of our analysis, we will assume the latter construction of the statements as Lapham did.

Lapham explained the "basis" for his cross-examination questions—the issue of who had collected the underwear did not become a focus of the trial until Miller raised it with Conway on direct examination and offered the photographs of the evidence bags containing the underwear and the gloves. According to Lapham, while Miller initially created the impression that a male police officer had collected the evidence,[4] she later presented a defensive theory that focused on the lack of male DNA—consequently, the lack of Valenzuela's DNA—on the underwear. In response, Lapham's cross-examination questions were, according to him, intended to establish that the evidence had been contaminated and that the lack of Valenzuela's DNA on the underwear would not have been surprising and would not have meant that he did not touch the complainants. Lapham explained that the inside-out gloves had probably transferred "skin cells" to the underwear, noting that the minor female DNA contributor had not been identified and confirming that that DNA had been found on one pair of underwear but not the other.

Lapham asserted that he had tried thirty to fifty child-victim cases as a prosecutor and that he had not had any reason to believe that this case would have resulted in Valenzuela's acquittal. At the close of the State's evidence, he had been "ready and willing" to submit the State's case to the jury for a verdict. He told the trial

_____

[4]During Miller's cross-examination of the investigator, she asked if the male officer who had responded to the complainants' house after the alleged offense was the person who had collected the complainants' clothing, and the investigator responded affirmatively. She then asked several questions about the "chain of custody collecting the evidence and taking it to the police department."

court that the morning of Conway's testimony, he had prepared for consideration and provided Miller with a copy of the trial court's charge.

Lapham testified that he had "strenuously" opposed a mistrial. He expressed that, for the complainants, having to testify in court had been a traumatic experience. He explained that the complainants had been crying in the courtroom and that he initially was not sure whether one of the complainants would even testify. Because of the effect that the trial had had on the complainants, he did not want to retry the case and have to put them back on the stand.

During closing arguments, the trial court asked Miller if she could provide any case law "like . . . whatever happened in this case," distinguishing cases in which the prosecution "may or may not have been trying to get a mistrial" from cases in which the prosecution "was actually trying to get a mistrial." Miller responded that she had not found any cases involving "a misstatement of evidence." The State's attorney then argued that even if Lapham had misstated the evidence, he did not do so with the specific intent to force Valenzuela to move for a mistrial. The trial court apparently agreed and denied habeas relief.

Valenzuela timely appealed.

## II. Standard of Review

Pretrial habeas relief is an "extraordinary remedy." *Ex parte Ellis*, 309 S.W.3d 71, 79 (Tex. Crim App. 2010). It is reserved for cases in which resolution of a legal issue in the applicant's favor must result in the applicant's immediate release. *Ex parte*

12

*Ingram*, 533 S.W.3d 887, 892 (Tex. Crim. App. 2017). Thus, an applicant may seek pretrial habeas relief "only in very limited circumstances." *Ex parte Smith*, 178 S.W.3d 797, 801 (Tex. Crim. App. 2005). One such "limited circumstance" is when, as here, an applicant alleges that double jeopardy has been violated. *See Ex parte Weise*, 55 S.W.3d 617, 619 (Tex. Crim. App. 2001).

We review the trial court's ruling on a pretrial writ of habeas corpus for an abuse of discretion. *Ex parte Paxton*, 493 S.W.3d 292, 297 (Tex. App.—Dallas 2016, pet. ref'd). We view the evidence in the light most favorable to the trial court's ruling and uphold it absent an abuse of discretion. *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006). In our review, "we must 'defer to implied factual findings supported by the record.'" *Ex parte Shires*, 508 S.W.3d 856, 860 (Tex. App.—Fort Worth 2016, no pet.) (quoting *Ex parte Flores*, 483 S.W.3d 632, 638 (Tex. App.— Houston [14th Dist.] 2015, pet. ref'd)). If resolving the ultimate question turns on applying legal standards, we review the trial court's determination de novo. *Paxton*, 493 S.W.3d at 297.

Here, the trial court made no explicit fact findings, and Valenzuela did not request express findings of fact and conclusions of law. Thus, we infer the necessary fact findings to support the trial court's ruling if they are supported by the record. *See Shires*, 508 S.W.3d at 860.

13

### III. Applicable Law

The Fifth Amendment of the United States Constitution provides that no person shall have life or limb twice put in jeopardy for the same offense. U.S. Const. amend. V. Generally, this provision—the Double Jeopardy Clause—protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); *Ramos v. State*, 636 S.W.3d 646, 651 (Tex. Crim. App. 2021).

A second prosecution for the same offense after a mistrial generally is not precluded by double jeopardy if the defendant requested the mistrial. *See United States v. Dinitz*, 424 U.S. 600, 607, 96 S. Ct. 1075, 1079–80 (1976); *Wheeler*, 203 S.W.3d at 322. However, a second prosecution *is* jeopardy-barred if the prosecutor's conduct giving rise to the defendant's motion was intended to provoke the defendant into moving for a mistrial. *See Oregon v. Kennedy*, 456 U.S. 667, 673, 102 S. Ct. 2083, 2088 (1982); *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007) (adopting the *Kennedy* standard as a matter of state constitutional law); *see also Ex parte Masonheimer*, 220 S.W.3d 494, 507–09 (Tex. Crim. App. 2007) (applying *Kennedy* to the State's "intentional" failure to disclose exculpatory evidence). Thus, a retrial is barred only when the prosecution acted with the specific intent to "goad" the defendant into requesting the mistrial or with the specific intent to avoid an acquittal. *Masonheimer*, 220 S.W.3d at 507–09; *Ex parte Floyd*, No. 02-22-00004-CR, 2022 WL 2753400, at *4

14

(Tex. App.—Fort Worth July 14, 2022, pet. ref'd) (mem. op., not designated for publication).

The Court of Criminal Appeals has set out a nonexclusive list of objective factors for courts to consider in assessing the prosecutor's state of mind: (1) Was the misconduct an attempt to abort a trial that was going badly for the State? Put another way, at the time the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal? (2) Was the misconduct repeated despite the trial court's admonishments? (3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct? (4) Was the conduct "clearly erroneous"? (5) Was there a legally or factually plausible basis for the conduct despite its impropriety? (6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they intentional? *Wheeler*, 203 S.W.3d at 324; *see Ex parte Roberson*, 455 S.W.3d 257, 260 n.1 (Tex. App.—Fort Worth 2015, pet. ref'd) (noting *Wheeler* was subsequently limited to intentional conduct). "The analysis of these factors is intended '[t]o differentiate the kind of intentional goading conduct which invokes the Double Jeopardy Clause from the inevitable mistakes made during a rough and tumble trial.'" *Ex parte Watson*, No. 01-19-00637-CR, 2020 WL 7517453, at *6 (Tex. App.—Houston [1st Dist.] Dec. 22, 2020, no pet.) (mem. op., not designated for publication) (quoting *Ex parte Ahn*, No. 08-14-00082-CR, 2015 WL 4940053, at *5 (Tex. App.—El Paso Aug. 19, 2015, no pet.) (not designated for publication)).

A habeas applicant bears the burden to prove his claim by a preponderance of the evidence. *See State v. Guerrero*, 400 S.W.3d 576, 583 (Tex. Crim. App. 2013); *Ex parte Chandler*, 182 S.W.3d 350, 353 n.2 (Tex. Crim. App. 2005).

## IV. Analysis

Valenzuela acknowledges that barring retrial due to prosecutorial misconduct is an "exceedingly rare" exception to the general rule. Nevertheless, he contends that the trial court abused its discretion by denying habeas relief because the State acted intentionally to avoid an acquittal. We disagree.

## A.      First *Wheeler* Factor

Valenzuela argues that at the time the trial court granted a mistrial, "there was a reasonable probability" that the jury would have acquitted him. The record indicates that the State's case was not as weak as Valenzuela suggests:

- Both complainants testified and described what Valenzuela had done to them. Michelle explicitly testified that Valenzuela's hand touched her where she "pee[s]" from.

- The complainants' mother testified about what she recalled from the night of the alleged offense and about the complainants' outcry statements. She described what Valenzuela had done to the complainants as it had been relayed to her by the complainants themselves immediately after it happened.

- The forensic interviewer described the interview process and testified generally about the complainants' interviews. She explained that the complainants were able to provide specific details about how Valenzuela had touched them, including sensory and peripheral details.

- The jury viewed the video of Michelle's forensic interview, in which she described to the interviewer exactly when, where, and how Valenzuela had

16

touched her. For example, she explicitly stated that he had touched her "private part" from where she "pees."

- The investigator testified about his investigation of the alleged offense and explained his probable cause to arrest Valenzuela.

- The therapist testified generally about the complainants' therapy sessions and why they needed therapy. She also testified about the type of trauma that the complainants experienced as a result of what Valenzuela had done to them.

This evidence establishes a convincing case against Valenzuela. Thus, it does not reasonably appear that Valenzuela was likely to obtain an acquittal.

Most of Valenzuela's appellate argument on this *Wheeler* factor focuses on the alleged inconsistencies in the complainants' testimonies.[5] Even if these inconsistencies were as significant as Valenzuela suggests, the jury heard the details of the alleged offense not only from the complainants but also from the complainants' mother and the forensic interviewer—to whom the complainants described what Valenzuela had done to them immediately after or within a day of the alleged offense. And the jury

---

[5]Valenzuela points out that on direct examination, the complainants testified that they had been in bed trying to go to sleep when Valenzuela entered their bedroom, but on cross-examination, Michelle "admitted" that they had only been pretending to go to sleep. This, according to Valenzuela, proves that he had only been "playing with the girls." He also points to Michelle's direct-examination testimony that she had been lying on her back during the alleged offense and to her cross-examination testimony that she had been lying on her stomach, arguing that the position of Michelle's body "carries great weight in determining the truth of her allegations." And the fact that Michelle did not use the word "vagina" at trial was, according to Valenzuela, the "[m]ost significant[]" inconsistency. As for Amy, Valenzuela asserts that, contrary to her outcry, she testified that he had touched her only near her tailbone. But Amy explicitly testified that he had touched her "on [her] butt . . . near [her] tailbone."

viewed Michelle's forensic interview firsthand. Lapham explained that inconsistencies in a child victim's testimony are generally not surprising when the child victim testifies about an event that occurred years prior. He opined that the inconsistencies in this case had been no different than in any other case with a child victim. The trial court was entitled to believe that Lapham had not been concerned about any inconsistencies in the complainants' testimonies and that the inconsistencies had not hurt the State's case.

Moreover, Valenzuela moved for a mistrial four times throughout the trial for three different reasons, suggesting that it was Valenzuela—not the State—who had concerns about the jury's verdict. *See United States v. Wharton*, 320 F.3d 526, 532 (5th Cir. 2003) (reaching same conclusion when defendant moved for mistrial four times). While Valenzuela asserts on appeal that "[t]he defense began its case with the reasonable expectation that the law would require the jury to acquit," his failure to request a directed verdict after the State rested suggests that the defense had no such expectation. *See id.*

According to Lapham, "[o]verall, the case went well for the State." He had "felt good about the State's case" and had had "every expectation that the [j]ury would ultimately find [Valenzuela] guilty." And he objected to the mistrial. The trial court could have reasonably concluded that Lapham's misconduct was not an attempt to abort trial. *See Wheeler*, 203 S.W.3d at 330 ("From all appearances, the prosecutor could well have thought that the trial was going fine.").

18

**B.    Second *Wheeler* Factor**

Valenzuela argues that Lapham "repeated his attempts . . . to mislead the jury with false information such that the defense requested a mistrial twice." The record indicates that Lapham repeated his cross-examination question about a male having worn the gloves and contaminated the evidence only once—with apparent permission from the trial court.

After the trial court denied Valenzuela's third request for a mistrial, it gave Lapham the opportunity to try again: "Mr. Lapham, in order to make the most of the time and the economy of in front of this jury, if you have a real point to make with the gloves, then I want you to make it right now, okay?" Lapham then asked Conway about the proper procedure for evidence collection and whether it had been followed in this case with the gloves and underwear. A few questions later, he specifically asked about concerns of cross-contamination. Miller did not object to any of these questions. When Conway testified that skin cells could have been transferred from the gloves to the underwear, Lapham asked his hypothetical question about a male having worn the gloves. That question elicited an objection from Miller. At that point, the jury was excused from the courtroom and did not return until the trial court granted the mistrial.

The trial court granted the mistrial after Lapham argued—outside the presence of the jury—that the jury could "give whatever weight . . . to whether they think that there's some cross-contamination with regards to this evidence." According to

19

Valenzuela, the trial court granted the mistrial because it "became apparent" that Lapham intended to "make such an irrelevant and misleading argument again to the jury." Even if Valenzuela were correct about the trial court's reasoning, the fact remains that Lapham repeated the misconduct only once before the jury was excused. *Cf. id.* at 328 ("[A] single violation of a motion in limine is insufficient to show repeated, willful violations made despite judicial admonitions.").

## C.     Third through Fifth *Wheeler* Factors

Valenzuela contends that the trial court did not find Lapham's explanation for his conduct to be credible or in good faith, citing the trial judge's comments at trial. The same trial judge, however, presided over the habeas hearing and, in denying habeas relief, could have determined that Lapham had provided a good-faith explanation for his conduct, that the conduct was not clearly erroneous, and that there had been a factually plausible basis for the conduct. *See id.* at 331 ("The trial judge saw the prosecutor and could judge his credibility and integrity . . . .").

Lapham explained that "[t]he purpose of the cross-examination was to expose the contamination of the [complainants'] underwear by the rubber gloves." Specifically, he intended to illustrate that the gloves, which presumably contained DNA, had contaminated the underwear, yet no DNA profile had been identified and the minor female DNA contributor had been detected in only one evidence bag, thereby establishing that touch DNA does not always result in collectible evidence. Lapham asserted that, had the trial court not granted the mistrial, he would have

asked Conway whether, in her expert opinion, the lack of Valenzuela's DNA conclusively established that he had not touched the complainants or their underwear. Conway's answer, according to Lapham, would have been, "No." Notably, he told the jury just as much in his opening statement. According to the State, this would have effectively rebutted the defense's theory that the lack of Valenzuela's DNA on the underwear meant that he had not touched the complainants.

Conway's testimony supported Lapham's explanation. She testified that the evidence had not been collected properly and that skin cells could have transferred from the gloves to the underwear, which supported Lapham's theory that the evidence had, in fact, been contaminated. Indeed, he repeatedly explained that his cross-examination was intended to expose the contamination in order to rebut Valenzuela's defensive theory regarding the lack of his DNA on the underwear.

While the area of inquiry in support of Lapham's theory may have been appropriate, albeit poorly executed, the specific statements about a male having worn the gloves were not. But nowhere in the record does it indicate that Lapham did not sincerely, though mistakenly, believe that a male may have worn the gloves. He asserted that the police report was "unclear" as to who had collected the evidence, but because he did not believe that the issue of who had collected the underwear would be a focus of the trial, he had not reviewed the police report or the body-camera footage pertaining to the evidence collection. Lapham ultimately acknowledged that no male DNA had been found on the underwear and that his statements about a male

21

having worn the gloves had been "incorrect" and "an error on [his] part." He maintained that he had "d[one] the best [he] could." The trial court could have concluded that Lapham's being wrong about the gloves did not mean that he intended to cause a mistrial. *See id.* at 329 ("The prosecutor may have misheard the witness or confused the testimony . . . , but that does not make him either [willful] or reckless.").

The trial court could have found that Lapham provided a reasonable, good-faith explanation for his conduct; that such conduct, while based in part on an incorrect understanding of the evidence, was not clearly erroneous; and that there was a factually plausible basis for the conduct. *See id.* at 330 ("We cannot disagree with the trial judge's implicit conclusion that [the prosecutor's cross-examination] question . . . was asked in good faith, albeit an impetuous . . . question.").

## D. Sixth *Wheeler* Factor

Valenzuela argues that "[t]hroughout trial, [Lapham] acted contrary to the rules and principles of law" and that he was "determined to prejudice the jury with inadmissible evidence" because there was not enough evidence to convict. As discussed above, the State's evidence established a convincing case against Valenzuela. Moreover, much like the habeas hearing, both the State and the defense attorneys were zealous advocates and clashed throughout trial.[6] That Lapham advocated

---

[6]For example, "object" or "objection" appear in the trial record at least one hundred times.

zealously for the State does not establish that he intended to cause a mistrial. *See id.* (deferring to trial court's fact finding in "hotly contested trial").

As for Lapham's actions leading up to the mistrial, the trial court could have concluded that Lapham's cross-examination constituted a lack of judgment or negligence: in other words, Lapham believed that Conway had raised an issue about who had collected the evidence—incorrectly thinking that a male may have worn the gloves—and that his cross-examination would provide the jury with the full picture, i.e., that the lack of Valenzuela's DNA should not be surprising. Such lack of judgment or negligence was properly remedied by the mistrial and does not bar a retrial. *See Lewis*, 219 S.W.3d at 358 (stating double jeopardy is not "a means to protect against outrageous government conduct"); *Ex parte Coleman*, 350 S.W.3d 155, 160 (Tex. App.—San Antonio 2011, no pet.) ("The impropriety of the prosecutor's [cross-examination] was remedied by the mistrial."); *cf. Kennedy*, 456 U.S. at 679, 102 S. Ct. at 2091 (holding prosecutor, who referred to defendant as a "crook" in front of the jury, did not intend to cause a mistrial); *Ex parte Aiken*, No. 05-07-01125-CR, 2008 WL 444484, at *2 (Tex. App.—Dallas Feb. 20, 2008, pet. ref'd) (mem. op., not designated for publication) (affirming denial of habeas relief where prosecutor's statement— calling defendant a "coward" and commenting on his decision to testify on his own behalf—did not rise to level of intent to cause mistrial).

## V. Conclusion

Viewing the evidence in the light most favorable to the trial court's ruling, we cannot say that the prosecution engaged in conduct specifically intended to provoke or "goad" Valenzuela into moving for a mistrial. Thus, the trial court did not abuse its discretion by denying habeas relief.

We affirm the trial court's order denying relief on Valenzuela's application for writ of habeas corpus.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 5, 2025

24